F6PKGANC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GANSETT ONE LLC, et al.,

                 Plaintiffs,

          v.                          15 CV 3551 (ALC)

HUSCH BLACKWELL LLP, et al.,

                 Defendants.

------------------------------x
                                      New York, N.Y.
                                      June 25, 2015
                                      10:22 a.m.

Before:

                    HON. ANDREW L. CARTER, JR.,

                                      District Judge

                         APPEARANCES

EPSTEIN ARLEN & OSTROVE LLC
     Attorneys for Plaintiffs
BY:  DAVID OSTROVE
     -AND-
RICHARD L. PLOTKIN

MATALON SHWEKY ELMAN PLLC
     Attorneys for Defendants
BY:  HOWARD IAN ELMAN
     -AND-
WHEELER TRIGG O'DONNELL LLP
BY:  CHRISTOPHER P. MONTVILLE

F6PKGANC

1          THE DEPUTY CLERK:  Civil cause for a premotion

2     conference on Case No. 15 CV 3551, Gansett One versus Husch

3     Blackwell, et al.

4          Counsel, please state your appearances.  For the

5     plaintiffs?

6          MR. OSTROVE:  Good morning, your Honor.  Elliot

7     Ostrove, Epstein Arlen & Ostrove, for the plaintiff.

8          MR. PLOTKIN:  And Richard Plotkin, Epstein Arlen &

9     Ostrove, also for the plaintiff.  And, your Honor, I have a

10    motion for pro hac vice admission which is still pending.

11         THE COURT:  Okay.

12         THE DEPUTY CLERK:  And for the defendants?

13         MR. ELMAN:  Good morning, your Honor.  Howard Elman,

14    of Matalon Shweky Elman, for the defendant Husch Blackwell.

15    I'm joined by my colleague, co-counsel, Chris Montville, who

16    came all the way from Colorado to see your Honor this morning,

17    and Mr. Montville's pro hac application is also pending.

18         THE COURT:  Okay.  Good morning.

19         Hold on just a second.

20         (Pause)

21         THE COURT:  Okay, we are here for a premotion

22    conference.  I've looked at the submissions from the parties.

23    Let me just get a clearer sense from the defendants about what

24    this motion is going to be about.  I know that you have some

25    concerns about the level of particularity in the complaint, but

1   let me just get a little further elucidation from the

2   defendants about this anticipated motion.

3            MR. MONTVILLE:  Your Honor, with my pro hac pending, I

4   assume that I can still speak?

5            THE COURT:  Yes.

6            MR. MONTVILLE:  Okay.  So --

7            THE COURT:  And you can remain seated if you'd like.

8            MR. MONTVILLE:  I love to stand.

9            THE COURT:  Okay.

10           MR. MONTVILLE:  The problem with this complaint goes

11  far beyond particularity.  This is an extraordinarily detailed

12  complaint, it's 39 pages, it's 149 paragraphs.  With all the

13  things that are in there, most of which have nothing to do with

14  my client, there is still no specific allegation that would

15  support the RICO predicate act, which apparently is mail wire

16  fraud that would support a fraud claim or would support the

17  standard in aiding and abetting fraud, which in New York State,

18  as well as the other states where it might apply, requires an

19  actual affirmative statement, some sort of substantive

20  assistance, or only an admission if there is some sort of

21  existing duty.

22           Now, this is a case where our client represented

23  companies that were a party to this lawsuit, they're being sued

24  by companies who did a transaction with our client.  This is

25  automatically a disfavored case.  It's someone trying to sue

4

F6PKGANC

1    someone else's lawyer for acting within the scope of their

2    legal services.

3              So with respect to the RICO claim, I don't think I'm

4    exaggerating when I say that none of the elements of the RICO

5    claim have been pled.  I mentioned the predicate act, which is

6    apparently mail and wire fraud, as reflected in the response to

7    our letter.  Mail and wire fraud requires some sort of

8    affirmative act, predicate act, by the defendant, him or

9    herself, or enabling the predicate act.  And there's no

10   allegation in the complaint my clients did anything

11   affirmatively except draft a document.

12             And the language that you will find dozens of times in

13   the complaint is that there were meetings.  And Diane Carter,

14   who's the lawyer involved, sat by at the meetings, she had

15   knowledge of these representations, she aided and encouraged

16   her client to do something.  That's not enough.  There are no

17   specific statements attributed to her.  It's just, she was a

18   lawyer, in the room, therefore, she is liable because she can

19   pay a judgment.  And that's the sort of complaint the courts in

20   New York regularly dismiss because simply for the in terrorem

21   effect of suing someone else's lawyer in the professional scope

22   ever their job.

23             The RICO claim also fails because there is a

24   requirement that there be a pattern of racketeering activity.

25   In this particular case, the entirety of the pattern lasted,

F6PKGANC

1    depending how generously you construe it, I would say, two

2    months of investments.  There were two investments that the

3    plaintiffs made with this nonparty, my client's client.  There

4    were four documents in two months.  My client drafted them,

5    that was her involvement.  New York State law -- or the Second

6    Circuit says that they have never recognized the pattern of --

7    closed any pattern of less than two years.

8           So here we're talking two months.  The first time my

9    client even met the plaintiff's principals was a total of five

10   months.  So, as a matter of law, in New York State, that cannot

11   be a pattern of a RICO.  And an open-ended continuity isn't

12   alleged.  That's a very exacting standard.

13          And then specific to the fact that my client is a

14   lawyer:  In the Ernst & Young case, the United States Supreme

15   Court, a similar case involving an accounting firm, not a

16   lawyer, was very clear that the defendant has to participate in

17   the management or control of the racketeering enterprise.

18   There is no allegation, not even a conclusory allegation, that

19   Husch Blackwell or Ms. Carter had any control over the

20   enterprise.

21          Which leads to the question of is there even an

22   enterprise.  And all that's alleged in the complaint is that

23   Mr. Nezami failed to disclose things that I don't believe were

24   material and that one person also cannot be an enterprise under

25   New York law.  So the RICO claim fails under very clear-cut

F6PKGANC

1    Second Circuit precedent.

2            The fraud claim fails, first, because of lack of

3    particularity.  Again, as I said, this is such a detailed

4    complaint that I would imagine that if there was anything that

5    Ms. Carter actually said, as opposed to standing idly by, as

6    opposed to sitting in the room, that there would be allegations

7    about that.  If -- there are allegations and I think the

8    plaintiffs have an obligation to amend so we don't have to go

9    through this motion to dismiss process twice.

10           The aiding-and-abetting claim, like I said, there has

11   to be substantial assistance.

12           There is also a negligent misrepresentation claim.  I

13   would respectfully say that this claim borders on frivolous.

14   There has to be a duty between the defendant and the plaintiff,

15   for a negligent misrepresentation claim, while it's clear

16   lawyers do not owe those kinds of duties to nonclients.  And

17   there also has to be an affirmative statement, and, again,

18   there's no affirmative statement alleged in the complaint.

19           So I think that this is a clear case of a whole bunch

20   of conclusory allegations, with words like the defendant

21   participated or encouraged.  There are no facts.  So this is

22   why we're moving to dismiss the complaint in its entirety.

23           Thank you.

24           THE COURT:  Thank you.

25           Anything from plaintiff on this?

F6PKGANC

1          MR. PLOTKIN:  Yes, your Honor.

2          THE COURT:  You may remain seated if you'd like, you

3     can stand; whatever you'd like to do.

4          MR. PLOTKIN:  I'll stand.

5          THE COURT:  Okay.

6          MR. PLOTKIN:  I'm not sure counsel is reading the same

7     complaint as we're reading, so if I can just go back and assert

8     what it is that is contained in this 149-paragraph complaint

9     that I would suggest is as detailed and specific as any

10     complaint I've ever seen prior to the discovery proceeding.

11          In any event, Diane Carter, ultimately a partner at

12     Husch Blackwell, had represented Mr. Nezami and his companies

13     for over ten years, and this is represented by Mr. Nezami in

14     the presence of Ms. Carter.  As we set forth in the complaint,

15     this is not a situation where an attorney only sat by and

16     allowed her clients to make misrepresentations.  This is a

17     matter -- and it's set forth at length in the complaint --

18     where the attorney actively participated in the fraud and in

19     the effort to defraud the plaintiffs.

20          Let me just highlight a few of the many items that we

21     referred to in the complaint.  It's asserted in the complaint

22     that Mr. Nezami, from and after September 2013, stole up to

23     $1.4 million from various private companies.  There's a number

24     of them; we collectively refer to them in the complaint as

25     private companies.

F6PKGANC

1            We also assert in the complaint that this embezzlement

2     of funds was learned of as of March 2014 by certain parties,

3     including Ms. Carter, a partner at Husch Blackwell, during the

4     agreements that have been entered into by the plaintiffs, dated

5     in March, April, May, and the final payment and signing was in

6     June, although the agreement was made as-of effective in

7     mid-May.  And we assert that Ms. Carter was part of the scheme

8     to cover up this fraud and keep the information from our

9     clients, to the point that at one of the meetings or telephone

10    conversations, in the presence of Ms. Carter, it was stated,

11    don't tell David or Sam.  David and Sam were two of the

12    representatives of plaintiffs.  And it went further, that, if

13    we tell David or Sam, the companies will go under.

14            Basically, it was decided prior to May 23rd, 2013,

15    that instead of going public and stating that Nezami had

16    embezzled up to $1.4 million, Ms. Carter participated in the

17    decision that she would prepare promissory notes and that the

18    books and records of the company would be modified to reflect

19    the $1.4 million as being loans and draws to Mr. Nezami.

20            On May 23rd, 2014, Ms. Carter prepared promissory

21    notes from Nezami to two of the companies, totaling up

22    $360,000, hence participating in the fraud, changing the theft

23    of funds into promissory notes that were never disclosed to our

24    clients.  This was occurring at the same time as communications

25    were going on and negotiations were being made with the

F6PKGANC

1    plaintiffs.

2         In another situation, on April 25th, 2014, Ms. Carter

3    prepared documents that gave a security interest to a third

4    party, Dr. Phelps, in the same companies that she later

5    prepared documents for the plaintiffs, saying that there were

6    no outstanding security interest.  Also, these documents that

7    were prepared with the plaintiffs indicated that there were no

8    outstanding judgments, liens or investigations.  We have

9    asserted in the complaint that Ms. Carter was aware that the

10   FBI was actively involved in the investigating Nezami, the IRS

11   was actively involved in investigating Nezami, and, to go one

12   step further, Homeland Security was actively involved in that.

13   So she clearly participated, actively and aided and abetted

14   this fraud.

15        Also, part of the interest acquired by the plaintiffs

16   was an interest in a company called Global Molecular Labs.  So

17   Ms. Carter prepared the documents indicating that Nezami owned

18   an interest in Global Molecular Labs when she knew that he did

19   not own an interest in Global Molecular Labs.  She was well

20   aware, we assert, that there were over $400,000 of outstanding

21   tax liens against Nezami, there were $3 million of judgments

22   outstanding against Nezami, and that nonetheless she went ahead

23   and prepared these documents, knowing full well that our

24   clients were being defrauded by this criminal enterprise.

25        She was part of this criminal enterprise, and, as a

F6PKGANC

partner in Husch Blackwell, Husch Blackwell likewise is

responsible for her acts.  There was another partner at Husch

Blackwell that participated in various meetings, and, we

assert, recklessly disregarded the facts and the clues that

were coming out of these various meetings and discussions.

We also assert in the complaint, and we attached an

exhibit, that Ms. Carter was to be given an equity interest in

a company -- that ultimately would be a beneficial interest in

a public company.  And whether or not that interest was ever

given to her, I don't know, but this interest was promised to

her.  We assert that this was to be a gift to Ms. Carter for

participating in this fraudulent scheme.

And as far as the Nezami clients were concerned, we

assert that they were a significant client of the firm and the

firm continued to represent that client, given the substantial

fees that it was being paid.

So for counsel to suggest that this is a situation

where a lawyer just sat by and remained silent as his or her

client was defrauding others, can't be further from the truth.

The complaint sets forth in great detail that Husch Blackwell

and Diane Carter aided and abetted on an active basis the fraud

of this criminal enterprise.  This criminal enterprise, we

assert, is an open-ended criminal enterprise and, as a result,

the case cited by the defendants, which does not hold as a

matter of law that a RICO claim, even in a closed-ended matter,

F6PKGANC

1     must be within -- more than two years.  There's no case in

2     New York with the Second Circuit holding that as a matter of

3     law there's a two-year break to it, but we don't even have to

4     address that here because this is an open-ended fraud.  Our

5     clients were just one -- actually four of many potential

6     investors that were defrauded.  In fact, our client was told

7     that they were looking to get another $50 million from

8     investors in the New York area.  They went with our client to

9     find office space in New York in order to have a foundation up

10    in New York to seek other investors to defraud.

11            So this fraudulent scheme that we lay out in the

12    complaint, we submit, is continuing even to this day.  And as

13    we set forth in our letter to your Honor, we've met all the

14    burdens, we submit, as far as the RICO claim is concerned.  The

15    wire and mail fraud issues are clear and set forth throughout

16    the complaint.

17            If I might, the Second Circuit has said that the test

18    of participating in and directing the enterprise's affairs is

19    a, quote, relatively low hurdle for plaintiffs to clear,

20    especially at the pleading stage.  The pattern of racketeering

21    activity is set forth at length; I just highlighted certain of

22    the more egregious acts that we set forth in the complaint, and

23    that certainly our client, the plaintiffs, were certainly

24    foreseeable victims of the fraud.

25            Certainly, at this stage of the proceeding, we submit

F6PKGANC

1    that the complaint substantiates all of the claims, whether it

2    be the common-law fraud claim, the RICO claim, the negligent

3    supervision claim, and the negligent misrepresentation claim.

4            Also, we've cited in the cases the Texas Disciplinary

5    Rule 1.02(c) and 4.01, which basically says that an attorney

6    cannot allow a client to misrepresent to others.

7            So even on the nondisclosure issue, which we go far

8    beyond, we submit that Husch Blackwell and Diane Carter

9    participated and should properly be in the case, but we don't

10   even have to focus on that because we have so many affirmative

11   statements in the complaint, and attaching as exhibits certain

12   documents, that demonstrate that Husch Blackwell and Diane

13   Carter were active participants in this fraud and that Husch

14   Blackwell failed to properly supervise Ms. Carter and

15   Mr. Carmen that we refer to in the complaint.

16           And as far as the damages, we've set forth our claim

17   for compensatory damages, RICO damages, and punitive damages.

18   And we've asserted in our letter to your Honor the basis for

19   that.

20           Thank you.

21           THE COURT:  Okay.

22           Let me just ask plaintiffs' counsel one question.  I

23   am curious:  The assertions regarding Ms. Carter's knowledge of

24   this alleged fraud, I just want to get a sense, where does that

25   information come from, in terms of the assertions that she knew

F6PKGANC

 1    about these frauds and knew that the nonparty was making false

 2    statements and the like?  Where does that come from?

 3          MR. PLOTKIN:  It comes from third-party witnesses.

 4    I've identified in the complaint, without naming him, I

 5    potential whistleblower who Mr. Nezami pointed a gun at him, as

 6    we say in the complaint, and took a knife to his throat and

 7    basically told him, you're either with us or against us.  And

 8    Ms. Carter, we say, is aware of that.  I have had many

 9    discussions with counsel for this potential whistleblower and

10    with the whistleblower also.

11          In addition, we have other information from other

12    parties that indicate that Ms. Carter was aware of everything

13    that we put in the complaint.  All of the specifics that I put

14    in the complaint, except where I say it's upon information and

15    belief, which are very few and far between, are based on

16    information I received from third parties.

17          Obviously, also, as far as comments that were made to

18    our client in meetings, for example, that our clients

19    participated in when Mr. Nezami and Ms. Carter and several

20    others sat in at 17 meetings in New York, at least 17 meetings,

21    with investment banking firms, with private equity firms and

22    with one hedge fund, a number of representations were made.

23    Those representations went into the financials, and we have

24    received -- the financials we were given were fraudulent and

25    did not include accurate information.  I received the updated

F6PKGANC

financials, compared them to the financials that we were given,

demonstrating that they were false, and we have information

from a number of sources that Diane Carter was fully aware of

everything that was taking place.

As I said, your Honor, a lot of investigation went

into this before we filed the complaint, and we certainly did

not just willy-nilly say, okay, we're going to pick this Am Law

100 law firm, with over 600 lawyers, and just sue them.  We

looked into this, I spoke to third parties, I myself spoke with

third parties, did the investigation, and everything that we

say in this complaint I'm very comfortable with, and that Diane

Carter was well aware of the fraud that we say started in, at

least on this level, back in 2010, when Nezami and his

interests acquired the public company out of bankruptcy that

ultimately became Titanium Healthcare.

If I were to tell you -- I couldn't come up with a

number, but I'd say at least five people that I have spoken to

have said Diane Carter knew everything that was going on and

was privy to the statements, don't tell David or Sam, meaning

our clients, or else the companies will go under, because our

clients obviously would have pulled the plug and not gone ahead

with the deal and the like.

We have been told that criminal proceedings are

imminent against Mr. Nezami, from the FBI, but I've been told

that for the last few months.  And the IRS, keeping in mind she

F6PKGANC

1   represented Nezami for over ten years, Nezami in all of the 17

2   meetings said he never does anything without Diane Carter's

3   blessing and Diane Carter knows everything that he does.  She

4   was present, as a matter of fact, at each of the meetings.

5   Nezami would say, Diane, who's the most conservative person you

6   know?  And she would respond, you are, Kam.  She was part and

7   parcel of this scam and actively participated in it, your

8   Honor.  And we would not lightly file a complaint against

9   anybody, but certainly filing a complaint against a lawyer, I

10  would make sure that we were on firm ground, which we did make

11  sure.

12          THE COURT:  I'm also curious:  Obviously, plaintiff is

13  in charge of your complaint and you can sue whomever you wish,

14  within limits, and you can choose not to sue people.  I guess I

15  was wondering as to why Nezami and these other entities are in

16  fact nonparties since the complaint seems to allege that they

17  were really critically engaged in this fraud.

18          MR. PLOTKIN:  Let me address the Nezami piece.

19          Nezami, we are told, has no assets, he is bouncing

20  checks, the FBI is about -- and I was told this two months

21  ago -- about to go against him.  In September of 2014, the IRS

22  took a number of cases pending against him around the country

23  and consolidated them all in Texas for $400,000 of tax liens

24  against him.  Basically, this isn't in the complaint, but as

25  part of the agreement with our client, our clients had the

F6PKGANC

1   right to ask for their money back within 18 months following

2   the execution of the agreements.  Once our clients learned of

3   the fraud -- actually, suspected the fraud strongly, in

4   October 2014, they exercised their right to get their

5   $1,350,000 back from Nezami and at the same time give back to

6   Nezami the interest that he passed.

7          Nezami was aware that I was a lawyer in New Jersey and

8   with contacts in New York, and he brought a declaratory

9   judgment action in Texas against our client, seeking

10   reformation of that agreement.  Our clients in Texas -- this is

11   Texas state court -- filed a counterclaim based on contract,

12   not on fraud.  That case is pending, but because we pretty much

13   have been told he has no assets and the government and the IRS

14   and everyone is coming down on him, we saw no reason to sue him

15   up here in New York, in that we have a separate and independent

16   claim against Husch Blackwell and against Diane Carter, and so

17   have no reason to sue Nezami.

18          As to the other parties that we identify in the

19   complaint as fictitious parties -- including we've sued

20   Mr. Hamby, who we have asserted participated in the fraud -- I

21   expect these people or certain people down in Texas to be

22   witnesses that will substantiate information that we have

23   received.  And at least at this juncture we didn't see the need

24   to file the complaint against anyone other than Diane Carter

25   and Husch Blackwell in that they clearly were the ones that

F6PKGANC

1  facilitated, aided and abetted this, and allowed this matter to

2  proceed.  And we felt it was in the best interests of our

3  client, number one, to sue Husch Blackwell and Diane Carter

4  without suing Nezami, and to not bring in the other parties and

5  to rely on them as potential witnesses but I will say that I

6  have met with the potential whistleblower and his attorney, and

7  everything that we say in the complaint is substantiated.

8       I also have other information that I am not at liberty

9  now to disclose to the Court or to counsel, on which we're

10  relying, but be that as it may, basically everything in that

11  complaint, other than what I say is on information and belief,

12  we have substantiation for.

13       THE COURT:  Okay, thank you.

14       I'm also I guess now -- always, but particularly now,

15  based on what's been stated here on the record -- wondering if

16  the parties have engaged in any sort of settlement negotiations

17  at all for these sort of settlement discussions because, again,

18  I don't know if this case is going to go beyond the pleading

19  stage, but if it does, this case might be expensive to

20  litigate, and I'm not sure if the parties have had any sort of

21  settlement discussions.

22       I don't want to know any numbers or anything like

23  that, but let me get a sense if the parties have had any sort

24  of settlement discussions or if the parties are in the position

25  that settlement is not going to happen, and if settlement

F6PKGANC

discussions have taken place, I'd just like to get a general

sense, perhaps in aquatic terms, as to the distance between the

parties, if we're talking about an ocean, a river, or a pond.

MR. PLOTKIN:  As to the parties, we are in discussion

with Defendant Hamby's attorney.  He's an individual, he was a

controller, and basically he wrote out the checks that were

signed by Nezami or another third party for the $1.4 million.

I'm hoping that we will be able to settle with him.

As far as discussions with the Husch Blackwell/Diane

Carter, there have been none, but I will be the first to

indicate that this case ought to be settled.  To the surprise

of some, there has been no press coverage about it, on the

case, that I'm aware of certainly, and we would encourage such

discussions to take place.

THE COURT:  Is there a particular reasons why

plaintiffs have not reached out to Husch Blackwell in terms of

a settlement discussion?

MR. PLOTKIN:  They haven't reached out to us, I

haven't reached out to them.  I'm now giving them a message

that we're prepared to talk settlement.  I'm not sure, I don't

think there's any big secret that the large exposure here is

based on the punitive damage claim, which is a substantial

exposure.  Husch Blackwell, based on the press release they

issued as of July 1, 2013, when they acquired Ms. Carter's

boutique law firm, that their gross for 2013 was $319 million,

F6PKGANC

they were one of the 100 largest law firms in the United

States, with over 600 lawyers in 17 states, plus a lawyer in

New York and an office in England, so that if we're able to go

to the jury, which I suspect and suggest we would be able to

go, the damages, potential damages, are enormous.

But if plaintiff is prepared to talk to us and include

settlement discussions that would include the potential

punitive damages, we would invite such discussions.

THE COURT:  Okay.  Because one of the concerns I have

in all litigation is that sometimes settlement discussions are

sort of like a seventh grade dance, no one wants to go first,

and typically it's the plaintiff's obligation to kind of make

that first move.  But it seems to me that it may make sense for

the parties to have some settlement discussions here before we

get into perhaps even this motion practice, another lengthy

litigation, but let me hear from defense counsel on this.

MR. MONTVILLE:  Yes, your Honor.  I'm going to preface

this by saying that I don't have authority to speak for my

client on settlement issues.  However, I may have misheard

Mr. Plotkin, but I believe one of the things that he said is

that this case has gotten publicity already.  I'm going to be

clear that we are --

THE COURT:  No, he said there hasn't.

MR. MONTVILLE:  It hasn't had publicity already.  That

is not going to be a motivating factor in settlement.

F6PKGANC

1          Our position on settlement is driven by this

2   complaint.  Everything I said earlier has been reconfirmed.  He

3   said several times that Husch Blackwell drafted documents,

4   things were said in the presence of Ms. Carter, and then there

5   were a lot of conclusory, she knew this, she knew that, she

6   participated in that.  That's not just Rule 90, that is an

7   Iqbal/Twombly issue, where the Second Circuit, this district

8   and New York State courts have been clear that you can't just

9   say someone had knowledge, you have to say why you believe

10  that.

11          If he's spoken to five people, if she was in the room

12  when something terrible was said, that might rise to knowledge.

13  It doesn't solve all these other problems of, she was only just

14  in the room, she was only drafting documents.  Those are the

15  only allegations, and that's what our case evaluation is

16  focused on.  This is an extraordinarily weak complaint.  I'm

17  not sure that this is the point to engage in these discussions.

18          THE COURT:  Okay, thank you.

19          Let's do this:  I will give plaintiffs' counsel an

20  opportunity to amend their complaint, if that's what you'd like

21  to do.  I'm not going to give you an advisory opinion as to

22  whether or not I think you have enough now or not, but,

23  generally, it's best to shoot your best shot, so I'll give you

24  an opportunity to amend the complaint if you'd like.

25          Let me find out:  Does plaintiffs' counsel want to

F6PKGANC

1   amend the complaint?

2           MR. PLOTKIN:  Your Honor, if I might speak to the

3   clients as well as counsel, I'm certainly not authorized now to

4   say we're not prepared to amend the complaint.

5           THE COURT:  All right.  So let's do this.  I will give

6   plaintiffs 30 days to file an amended complaint.  In 30 days --

7   let's do this.  In two weeks, let's have a joint status report

8   by the parties, and there's not going to be much input from the

9   defendants on this, but I'd like to know in two weeks whether

10  or not plaintiffs have decided to file an amended complaint,

11  let's get that done.

12          So two weeks from today would be when, Tara?

13          THE DEPUTY CLERK:  July 9th.

14          THE COURT:  Let's give a date for the filing of that

15  amended complaint, if the plaintiffs wish to do so, 30 days

16  from now, which would be when, Tara?

17          THE DEPUTY CLERK:  The 24th of July.

18          THE COURT:  Okay.

19          And then we will give -- if in fact there is an

20  amended complaint filed, we don't need to have another

21  premotion conference.  I think that we'll just go ahead and

22  give the defendants a motion schedule to file their motion to

23  dismiss.

24          Let's do that 30 days after July 24th, which would be

25  when, Tara?

F6PKGANC

<table>
<tr><td>1</td><td>THE DEPUTY CLERK:  The 24th, Monday, August 24th.</td></tr>
<tr><td>2</td><td>THE COURT:  Okay, August 24th for the defendants'</td></tr>
<tr><td>3</td><td>motion to dismiss.</td></tr>
<tr><td>4</td><td>We'll give the plaintiffs three weeks to respond to</td></tr>
<tr><td>5</td><td>that, which will take us to when, Tara?</td></tr>
<tr><td>6</td><td>THE DEPUTY CLERK:  September 14th.</td></tr>
<tr><td>7</td><td>MR. PLOTKIN:  Your Honor, in light of the summer</td></tr>
<tr><td>8</td><td>holiday and the Labor Day holiday, can you extend that to an</td></tr>
<tr><td>9</td><td>additional week?</td></tr>
<tr><td>10</td><td>THE COURT:  That's fine.  So that's September 21st?</td></tr>
<tr><td>11</td><td>THE DEPUTY CLERK:  Yes.</td></tr>
<tr><td>12</td><td>THE COURT:  And then we'll give the defendants two</td></tr>
<tr><td>13</td><td>weeks to file any reply, which will be when, Tara?</td></tr>
<tr><td>14</td><td>THE DEPUTY CLERK:  October 5th.</td></tr>
<tr><td>15</td><td>THE COURT:  Okay.</td></tr>
<tr><td>16</td><td>So we have the motion schedule, obviously.  And,</td></tr>
<tr><td>17</td><td>again, in two weeks I want a joint status report just letting</td></tr>
<tr><td>18</td><td>us know whether the plaintiffs wish to file the amended</td></tr>
<tr><td>19</td><td>complaint.  I don't think it necessarily makes a lot of sense</td></tr>
<tr><td>20</td><td>to change a lot of other things.  So I guess if you want a</td></tr>
<tr><td>21</td><td>two-week period of time, the plaintiffs say that they don't</td></tr>
<tr><td>22</td><td>wish to file the amended complaint, let's just keep the motion</td></tr>
<tr><td>23</td><td>schedule that we have in place; we don't need to adjust it for</td></tr>
<tr><td>24</td><td>that extra two weeks.</td></tr>
<tr><td>25</td><td>Anything else from plaintiffs today?</td></tr>
</table>

F6PKGANC

1          MR. PLOTKIN:  If there is a decision to file the

2     amended complaint, then the schedule that your Honor listed is

3     the applicable schedule?

4          THE COURT:  Correct.

5          MR. PLOTKIN:  All right.

6          THE COURT:  Yes.

7          MR. PLOTKIN:  And if the motion is directed, let's

8     say, solely to the RICO counts, would defendants still required

9     to file an answer to the complaint in the common-law fraud

10    counts and negligent supervision and negligent

11    misrepresentation is also the complaint?

12          THE COURT:  If that's the -- yes.

13          And defense counsel?

14          MR. MONTVILLE:  Your Honor, the only other question I

15    have regards the discovery schedule.  We would ask that there

16    not be a 26(f) conference, the discovery not start under way,

17    until there is a decision on the motion to dismiss.

18          THE COURT:  I think typically I don't like to stay

19    discovery, but it may make sense in this case -- let me hear

20    from plaintiffs.  What's your position on this?

21          MR. PLOTKIN:  Your Honor, I would just as soon like

22    the opportunity to proceed with discovery and not wait for the

23    conference.

24          THE COURT:  Well, I think defense counsel is saying

25    wait even past the conference.  I think he's talking about

F6PKGANC

1    after the motions have been decided.

2              MR. MONTVILLE:  That's correct, your Honor.  And I

3    know that this is an act of discretion, there's nothing in the

4    rule that says discovery waits until motion to dismiss has been

5    decided, but as your Honor pointed out, this is a very

6    expensive case, discovery in this case is going to be

7    extraordinarily complicated.  As I have said, I believe the

8    complaint is very weak.  At a minimum, things are, I would

9    imagine, certainly going to be narrowed.  Starting expensive

10   discovery, ESI, engaging that whole process, before we really

11   know whether there's going to be a case or what the case is

12   going to be about, I think that that's not a good use of

13   anyone's resources, including the Court's.

14             THE COURT:  Do defendants at this time anticipate that

15   you will be filing a motion to dismiss on all of the charges in

16   the complaint?

17             MR. MONTVILLE:  Yes, your Honor.  Unless there is a

18   radical new universe of facts that for some reason is not in

19   the 39 pages, I can't imagine that we wouldn't move to dismiss

20   all claims.

21             THE COURT:  When you talk about expensive discovery,

22   what are you talking about in this case?

23             MR. MONTVILLE:  Well, if you look at the complaint, it

24   lists, I'm going to guess about two different companies.

25   Although it's not true that Husch Blackwell represented

F6PKGANC

1    Mr. Nezami on more than a couple isolated cases, Husch

2    Blackwell did do work for companies he was affiliated with on a

3    number of matters for an extensive period of time.  This is

4    going to start with discussions, I would hope not in dispute --

5    we're talking dispute about the scope of discovery -- then

6    there's an attorney-client privilege between Husch Blackwell

7    and all those companies.  If the plaintiffs think they're

8    entitled to privileged material, we're required to defend that

9    privilege.  So that issue is going to come up.

10         Once that is all resolved, we're going to have to pull

11   files from dozens -- I do believe it's going to be dozens -- of

12   custodians to see if there's relevant material that in many

13   years -- I don't think most of that stuff is going to be

14   relevant, but I expect plaintiffs will take the position it

15   does, and all of that's going to have to be worked out.  It's

16   going to be very costly.

17         THE COURT:  Okay.  Let's do this.  I believe the last

18   date for the reply is October 5th.

19         Is that right, Tara?

20         THE DEPUTY CLERK:  Yes.

21         THE COURT:  Let's have a date about three weeks after

22   that, for a conference.  And counsel can be free to appear by

23   telephone, and at that conference we can discuss whether or not

24   discovery should go forward.  We'll hold off on discovery in

25   the short term but we'll see where we are.

F6PKGANC

1          Once everything's been fully briefed, because it might

2     be that with the amended complaint that the defendants don't

3     wish to file a motion to dismiss on everything or, even if they

4     do, there may be some claims that it might be more obvious are

5     going to continue in this case and it would be helpful to kind

6     of have a sense of where we're going with discovery because

7     this does seem to be a case, the discovery issues are going to

8     have several layers to them, with attorney-client privilege

9     issues, with what plaintiffs' counsel has stated about the

10    third party potentially Fifth Amendment issues and all sorts of

11    other issues with witnesses at depositions and the like, so it

12    may make sense to have a clearer sense of where we are, but I

13    don't want to just delay discovery indefinitely.

14          So let's do that, let's hold off on discovery for now,

15    and let's have a conference on October 26th.

16          Can we get a time, Tara?  And we can do it by

17    telephone?

18          THE DEPUTY CLERK:  1:00 o'clock.

19          THE COURT:  Does 1:00 o'clock work for everyone?

20          MR. PLOTKIN:  Yes.

21          MR. MONTVILLE:  Yes, your Honor.

22          THE COURT:  So let's do that and see where we are.

23          Anything else from plaintiff today?

24          MR. PLOTKIN:  There are two motions pending, one on

25    our behalf, for me, and one for counsel pro hac vice.  And

F6PKGANC

1    other than that, no.

2             THE COURT:  Okay, yes, so we've examined those

3    motions.  We will grant the motions for pro hac vice.

4             MR. PLOTKIN:  Thank you, your Honor.

5             MR. MONTVILLE:  Thank you, your Honor.

6             And does that include my partner, Carolyn Fairless?

7             THE COURT:  Yes.

8             MR. MONTVILLE:  Thank you.

9             THE COURT:  Anything else from plaintiffs' counsel

10   today?

11            MR. PLOTKIN:  No, your Honor.

12            THE COURT:  Anything else from defense counsel today?

13            MR. MONTVILLE:  No, your Honor.  Thank you, Judge.

14            THE COURT:  Thank you.  Have a good day.

15            (Adjourned)

16

17

18

19

20

21

22

23

24

25