UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| GANSETT ONE, LLC, SES WEALTH ADVISORS, LLC, GW HOLDINGS, LLC, and MAST AND SON, LLC, | : : : : | Case No. 15-cv-03551(ALC) |
| Plaintiffs, | : : : | |
| - against - | : : : | **FIRST AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL** |
| HUSCH BLACKWELL, LLP, DIANE T. CARTER, JOHN DOES 1-10, JANE DOES 1-10, and ABC CORPS. 1-10, | : : : : | |
| Defendants. | : : : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Gansett One, LLC ("Gansett"), SES Wealth Advisors, LLC ("SES"), GW Holdings, LLC ("GW"), and MAST AND SON, LLC ("Mast") (collectively, the "Four Entities" or "Plaintiffs"), by and through their undersigned attorneys, as and for their First Amended Complaint against Defendants Husch Blackwell, LLP ("Husch"), Diane T. Carter ("Ms. Carter"), John Does 1-10, Jane Does 1-10, and ABC Corps. 1-10 (collectively, "Defendants") herein allege as follows:

## NATURE OF THE ACTION

1.     This is an action to remedy violations of the Federal Civil RICO statute, aiding and abetting fraud, common law fraud, negligent misrepresentation, and negligent supervision arising out of a conspiracy perpetrated by Defendants together with Kamran Nezami ("Mr. Nezami") and Kamran Nezami, LLC ("Nezami LLC") (collectively, the "Nezami Sellers") concerning the solicitation and sale of securities in several affiliated companies for $1.35 million

and other fraudulent actions, which are continuing. Through a series of in-person meetings that took place in New York and many interstate e-mails, text messages, and phone calls directed to the Plaintiffs, some of whom had offices in New York during the relevant period of time, the Nezami Sellers, with the help and active assistance of Defendants, made false and misleading statements to the Four Entities in order to entice them to make investments substantially in excess of the $1.35 million they invested and to seek substantial additional investments from third parties.

2.     This action also seeks to hold Husch accountable for its negligent supervision of Ms. Carter and Steven Carman ("Mr. Carman"), among others, concerning Ms. Carter's and Mr. Carman's representation of the Nezami Sellers as detailed below.

3.     The Nezami Sellers, together with Defendants, made the false and misleading statements identified herein and otherwise committed their fraud despite knowing that the investments being made by the Four Entities were to benefit, in part, The Max Cure Foundation, Inc., a 501(c)(3) non-profit corporation that had its principal place of business during the times relevant to allegations herein, through December 31, 2014, located at 1350 Avenue of the Americas, 2nd Floor, New York, New York 10019.

4.     Formed in December, 2008, The Max Cure Foundation's mission is to fund cures for pediatric cancers, primarily through the Max Cure Fund at Memorial Sloan-Kettering Cancer Center in New York City, in an effort to find cures and to discover less toxic treatments for children with cancer; to assist low income and military families battling cancers in their children and to advocate for children with cancer and their families while, at the same time, raising awareness among the public to the pediatric cancer cause and issues.

5.    In addition to knowing that the investments were to benefit The Max Cure Foundation, the Nezami Sellers, together with Defendants, sought to use the connection that the Foundation has to doctors and hospitals throughout the country, including in New York, as a means to solicit others for investments and for other business purposes.

6.    While the Four Entities were being solicited for their investments and during the period of time that the Four Entities actually funded their investments that had been solicited by the Nezami Sellers, Ms. Carter – and consequently Husch – knew that Mr. Nezami had embarked on an unlawful scheme to obtain funds fraudulently and to convert funds belonging to the Private Companies and belonging to Titanium Healthcare, Inc. ("Titanium" or the "Public Company").[1]

7.    That unlawful scheme, which continues to the present, was aided and abetted and actively participated in by Husch.  Among other things, it includes Mr. Nezami's fraudulent misrepresentation of the financials of the Private Companies, and includes his embezzlement and theft of no less than $1.2 million to $1.4 million from certain of the Private Companies, including, but not necessarily limited to, $350,000 from Global Molecular Labs, LLC, $360,000 from HealthScripts Specialty Pharmacy, LLC ("HSP"), $250,000 from the POPS (defined below in paragraph 50), and $250,000 from Titan Partners Management, LLC.

8.    Upon discovery of the embezzlement by Mr. Nezami, prior to certain if not all of the Four Entities making their investments, the companies, with the knowledge, encouragement and advice of Ms. Carter, had already established a payment plan for Mr. Nezami to return the monies he had stolen.  This payment plan was not disclosed to the Four Entities.  If it had been

---

[1]    As used herein, the term "Private Companies" refers to and includes HealthScripts Specialty Pharmacy, LLC, HealthScripts Management Services, LLC, Global Molecular Labs, LLC, Titan Genomix, LLC, Healthlabs of America, LLC, In-Office Lab Management, LLC, Titan Partners Management, LLC, Titan Partners, LLC, and numerous privately held companies identified in the aggregate as the Pharmacy Affiliates, otherwise, as set forth in paragraph 50, known as the "POPS."

disclosed, investments by the Four Entities would not have been made and those investments already made would have been demanded to be returned.

9.    Contrary to her obligations, including, but not limited to those specifically set forth in Texas Disciplinary Rules 1.02(c), (d), and (e), 1.05(c)(7) and (8), 1.15(2) and (3), 4.01(b), and/or 8.04, Ms. Carter was an active participant in the fraud and unlawful scheme as described in more detail below.

10.    Mr. Carman, a partner with Husch, learned of facts that put him on notice of the fraud and unlawful scheme. In reckless disregard of the damage to be caused to the Four Entities and others, Mr. Carman nonetheless allowed the conduct to continue. In that regard, among other things, Mr. Carman attended meetings in New York City and was involved in interstate e-mail communications and phone calls through in or about September, 2014, forming a part of Defendants' fraud and racketeering activity.[2]

11.    Others affiliated with the Private Companies whose identities are not fully known and whose participation is not fully explained herein (referenced as fictitious defendants John Does 1-10, Jane Does 1-10, and ABC Corps. 1-10) first learned of the fraud and theft by Mr. Nezami at a meeting or meetings and/or conference calls in or about February, March, or April, 2014, which meeting(s) were attended by, among others, Ms. Carter in person and by telephone. Ms. Carter was present at meetings, both in person and by phone, of the executives where, among other things, the fraud, including the theft by Mr. Nezami was discussed and addressed.

---

[2]    Mr. Carman is a member of the New York, Missouri, and Texas bars. He is a former member of the Executive Board of Husch and is currently on its Partner Board. Mr. Carman has served clients in the financial services, transportation, manufacturing and real estate industries and represented several early stage technology-focused companies on matters ranging from incentive compensation structures to technology licensing agreements. He is currently the leader of Husch's Energy and Natural Resources industry team.

12.     Rather than disclose the fraud and theft to the Four Entities during the period in which the Four Entities were making their respective investment decisions (or, at the very least withdraw from representation of the Companies and/or the Nezami Sellers so as to not be actively involved in the fraud being committed), Defendants withheld information from Plaintiffs and otherwise continued to participate in and actively support Mr. Nezami's fraudulent conduct, contrary to their obligation at law and under the Texas Disciplinary Code. As just one example, Ms. Carter aided and abetted the wrongful conduct by, among other things, drafting and having other lawyers at Husch draft documents she knew contained affirmative misrepresentations.

13.     As another example, Ms. Carter also advised the Private Companies to treat the funds that were stolen by Mr. Nezami as "loans" and/or "draws" to be repaid to the Private Companies from, upon information and belief, among other sums, monies to be paid (and monies that had been paid) by the Four Entities and participated in the decision by the Private Companies to not tell Plaintiffs about the theft.

14.     Husch, in furtherance of the unlawful scheme described herein, prepared two Promissory Notes from the Nezami Sellers dated May 23, 2014, in favor of two of the Private Companies in the aggregate sum of $360,000 ($180,000 each), with the balance of the stolen funds being characterized on the financial records of certain of the Private Companies as "loans" or "draws" to Mr. Nezami. Copies of these Promissory Notes are attached hereto as Exhibits E and F.

15.     Upon information and belief, upon the advice and acquiescence of Ms. Carter, the $1.2 million to $1.4 million in "loans" or "draws" were not included on the Private Companies' financial statements. As such, when the Four Entities conducted due diligence on the Private Companies, the financial statements they were given did not include the $1.2 million to $1.4

million in "loans" or "draws," making it look like the Private Companies had more money than they actually had and allowing Mr. Nezami to continue his unlawful scheme and fraud, making it appear that the companies were more successful than they were.

16.     Indeed, in the presence of Ms. Carter at one or more of the meetings at which Mr. Nezami's theft was discussed, it was specifically mentioned that the representatives of the Four Entities should not be told of the theft of the funds (or of the purported "loans" or "draws") because that would cause them to not make the investments that were made thereafter by Gansett ($600,000) and GW ($250,000) and would cause SES and Mast to demand the return of their investments ($500,000), if such meetings occurred after SES and Mast made their investments in March 2014. It was also stated if the representatives of the Four Entities would be told of the theft by Mr. Nezami , then they would cause the Private Companies and Titanium to be destroyed.

17.     In meetings in New York City – in the presence of Ms. Carter and Mr. Carman – Mr. Nezami gave the Private Companies' financials as of October 2013 and projections for 2014 and 2015 to the Four Entities, to Sam Tobias ("Mr. Tobias"), to David Plotkin ("Mr. Plotkin"), and to certain of the investors in the Four Entities. (Those financials were also emailed from Texas to New York and New Jersey to Mr. Tobias, Mr. Plotkin, and certain of the investors). It was specifically represented to the Four Entities that the Private Companies' annual year-end financial statements would not change or differ materially from what was reflected on the October 2013 financial statements given to the Four Entities in connection with their due diligence prior to investing in the Private Companies.[3]

---

[3]     David Plotkin is the Manager of Gansett, one of the Four Entities.  Sam Tobias is the Manager of SES, another of the Four Entities.

18.     Those representations were false because the financial statements for year-end 2013 did materially differ from what was given to the Four Entities – particularly, for among other reasons, because the fraudulent "loans" or "draws" were later added to the Private Companies' financial statements after the Four Entities' due diligence and investments in the Private Companies.

19.     Before the Four Entities made their investments, when Robert Ham, Controller of one or more of the Private Companies, was asked for financial statements for year-end 2013, which included November and December 2013, the Four Entities were told that the projections were accurate and the numbers would not materially change from what was presented. Mr. Ham was told by Mr. Nezami, with the knowledge and consent of Ms. Carter, not to give the Four Entities the new year-end financials because it would show information that Mr. Nezami and Ms. Carter did not want the Four Entities to know. As a result, Mr. Ham told the Four Entities that the requested financials for the full year 2013 were not ready for distribution because he had not completed the financials for the POPS. During this period, Mr. Nezami, with fraudulent intent, pressured the Four Entities both verbally and in interstate emails to make the investments or "lose the opportunity of a lifetime."

20.     At the request of Mr. Nezami – and with the knowledge and active participation of Ms. Carter – representatives of the Four Entities attempted to raise additional funds in exchange for equity interests in the Private Companies and in Titanium (the Public Company). The Four Entities would not have attempted to raise such additional funds if Mr. Nezami and/or Defendants had told the Four Entities about the theft of funds by Mr. Nezami. The efforts of the representatives of the Four Entities to raise funds for Titanium were successful, and investors obtained shares in Titanium for an amount in excess of $100,000.

21. Ms. Carter was to be given, or, upon information and belief, was given, for no consideration – other than participating in the unlawful scheme and criminal enterprise – a Class C equity interest in Titan Partners, LLC that would constitute a 0.35% membership interest in that entity. Titan Partners, LLC, owns 51% of Titanium (the Public Company).

22. The Private Companies – at the direction of Mr. Nezami and with the concurrence, support, and participation of Husch (through Ms. Carter and Mr. Carman), and others identified as fictitious defendants John Does 1-10, Jane Does 1-10, and ABC Corps. 1-10 – attempted to cover up the unlawful scheme through, among other things, Mr. Nezami's threats on the life of one of the now former executives of the Private Companies and/or Titanium (the "Potential Whistleblower") who would not join in the continuing criminal enterprise and/or the fraudulent conduct described herein.

23. Upon information and belief, other efforts at a cover-up included a "trumped up" charge of wrongdoing by the Potential Whistleblower in an effort to remove him from the Private Companies and/or Titanium and to try to silence him. Defendants further attempted to cover up the unlawful scheme by the Nezami Sellers by Husch (through Ms. Carter) having asked the Potential Whistleblower to sign a Release and Confidentiality Agreement upon the July 30, 2014 unilateral termination of his at-will employment in exchange for a sum of money not otherwise due him. The Potential Whistleblower rejected this offer.

## THE PARTIES

24. Plaintiff Gansett is a Delaware Limited Liability Corporation with a principal place of business in New Jersey.

25. Plaintiff SES is a New York Limited Liability Corporation with a principal place of business in New Jersey.

26.     Plaintiff Mast is a New Jersey Limited Liability Corporation with a principal place of business in New Jersey.

27.     Plaintiff GW is a New Jersey Limited Liability Corporation with a principal place of business in New Jersey.

28.     Upon information and belief, Defendant Husch is a law firm and limited liability partnership organized and existing under the laws of the State of Delaware with a principal place of business in Kansas City, Missouri. As of 2013, Husch consisted of about 600 lawyers located in offices throughout the United States and in London. According to its website, Husch has at least one attorney who is held out to be "Husch Blackwell's full-time resident New York attorney, where he operates from several locations in the New York City metropolitan area." That attorney, according to the Husch website, "handles cases throughout New York State." Husch's expected gross revenue in 2013, according to a June 19, 2013 press release issued by the firm, was $319.0 million, with Husch, as of 2013, being included in the AmLaw Top 100 largest law firms in the United States.

29.     Upon information and belief, Defendant Ms. Carter is an individual residing in the State of Texas, is a member of the Bar of the State of Texas, and has been a partner in Husch since July 1, 2013. Ms. Carter specializes in, among other things, healthcare and corporate law. Ms. Carter advises clients on corporate, transactional, regulatory and compliance matters. She has more than 20 years of experience representing clients transacting business in the healthcare industry. Her clients include, among others, physician practices, hospitals, ambulatory surgery centers, rehabilitation facilities, managed-care organizations, nonprofit healthcare organizations, pharmacies, and management companies.

30.     Prior to July 1, 2013, Ms. Carter was a partner in Brown McCarroll, LLP ("Brown McCarroll"), a law firm with an office located in Austin, Texas.  On or about July 1, 2013, Brown McCarroll merged with and into Husch, (the "Merger"), and Ms. Carter became a partner of Husch as a result of the Merger.

31.     Defendants John Does 1-10 are individuals, unknown at this time, who participated in and/or facilitated the criminal enterprise and/or fraud and misrepresentations described herein.

32.     Defendants Jane Does 1-10 are individuals, unknown at this time, who participated in and/or facilitated the criminal enterprise and/or fraud and misrepresentations described herein.

33.     Defendants ABC Corps. 1-10 are entities, unknown at this time that participated in and/or facilitated the criminal enterprise and/or fraud and misrepresentations described herein.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

35.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.   The Long-Standing Relationship between Ms. Carter and Mr. Nezami

36.     According to www.Bloomberg.com, Mr. Nezami serves as President, Treasurer, Manager, and Director at HealthScripts of America-Pearland, LLC.  He also serves as President, Treasurer and Director at HealthScripts of America-Houston Galleria, LLC.  He serves as the President of Global Molecular Labs, LLC and Chief Executive Officer of In-Office Physician

Management Services, LLC. He also serves as the President, Treasurer and Manager of HealthScripts Funds in Fund Complex. He serves as the Chief Executive Officer of several other pharmacies in various locations across the United States. As such, he is responsible for the overall development and implementation of the strategic vision and operating initiatives that drives each of the businesses. He has served as the Chief Executive Officer and President of University General Health System, Inc. He serves as a Director of Global Molecular Labs, LLC and has been a Director at SMSA Gainesville Acquisition Corp. since December 31, 2013. He serves as President and Executive Director for HealthScripts of America-Hill Country, LLC. And, he serves as a Director of various funds in the fund complex of HealthScripts of America funds.

37.     For at least the past eleven years, Ms. Carter has represented, and continues to represent through Husch, Mr. Nezami. During that period of time, Ms. Carter has represented and continues through Husch to represent entities controlled by Mr. Nezami and/or entities in which Mr. Nezami owned and/or owns equity interests either personally or through Nezami, LLC, or such other organization(s) controlled by him.

38.     Upon information and belief, for all or most of that at least eleven year period, Ms. Carter provided advice to Mr. Nezami and actively participated in the fraudulent schemes he perpetrated on many, including, but not limited to, the Four Entities.

39.     Mr. Nezami introduced Ms. Carter to representatives of the Four Entities and/or otherwise referred to her as his personal lawyer. In so referring to her, Mr. Nezami said that she is considered by him to be extremely conservative (a belt and suspenders-type lawyer) and that he does not do anything in business without consulting with her. Mr. Nezami has also stated that Ms. Carter knows more about him than any other person and that Ms. Carter "runs his life." In

addition, Ms. Carter frequently travels with Mr. Nezami on business trips and on trips not directly related to business matters.

40.     Ms. Carter is, and has been for some time, the Executrix under Mr. Nezami's Last Will and Testament and is referred to in his personal financial statements as his personal attorney.

41.     Upon information and belief, leading up to the Merger, Husch performed due diligence of Brown McCarroll and its partners, including of its financial condition, and identified the clients of that firm who generated substantial income for Brown McCarroll. Upon further information and belief, such clients included Mr. Nezami and the companies in which Mr. Nezami owned equity interests.

42.     Upon information and belief, prior to the Merger, partners in Husch spoke with partners of Brown McCarroll (including Ms. Carter), and addressed with Ms. Carter, among other things, her representation of Mr. Nezami and companies in which he had equity interests.

43.     Upon information and belief, Brown McCarroll's representation of Mr. Nezami and of companies in which he had equity interests was a factor considered by Husch in agreeing to the Merger, having satisfied itself that Ms. Carter would continue to represent Mr. Nezami and such companies in which he had equity interests.

44.     With the Merger completed, soon after July 1, 2013, Husch assigned Mr. Carman to be resident in its Austin, Texas office in order to, among other things, ease the transition of the former Brown McCarroll firm into that of the merged firm, Husch, and serve as the liaison between the former Brown McCarroll partners and management of Husch.

45.     Up through and including November, 2014, Mr. Nezami controlled both the Private Companies and Titanium (the Public Company). Husch, through Ms. Carter and perhaps

other attorneys at Husch, prepared the Operating Agreements for the Private Companies and prepared the legal documentation for Titanium and its predecessor company, SMSA Gainesville Acquisition Corp., including all SEC filings up through and including on or about September 1, 2014, at which time Titanium terminated its representation by Husch and retained other counsel to represent its interests.

46.    Husch, in giving Mr. Nezami total control of the Private Companies and Titanium, aided and abetted and conspired to participate in the racketeering enterprise and otherwise fraudulent conduct of Mr. Nezami by knowingly facilitating Mr. Nezami's commission of unlawful acts.

47.    At a meeting on October 29, 2014, at Blackhawk Country Club in Richmond, Texas, Mr. Nezami – who was not in attendance – was removed from his management and governance role in the main pharmacy, HSP, because of his theft of funds, but Mr. Nezami remained as the manager of the POPS.

48.    At the meeting referenced in the preceding paragraph, the new Chief Financial Officer of HSP reviewed and presented the 2013 financials and explained in detail to those present (in person and by phone), the new net income numbers for HSP and why the numbers were 50% lower than what had been represented to the Four Entities. The lower net income numbers were, according to the Chief Financial Officer, a direct result of "Nezami's embezzling money, his fraud, and the over-distributions paid out in 2013." The Chief Financial Officer also explained that, as a result of the guidance and advice from Ms. Carter (and, therefore, Husch), Mr. Nezami would step down from his management and governance role at HSP and from certain of the other Private Companies because of Mr. Nezami's theft, fraud, and threat to the Potential Whistleblower's life by pointing a gun with a red laser beam at his chest (he neglected

-13-

to reference Mr. Nezami's putting a knife to the Potential Whistleblower's throat). Nonetheless, Mr. Nezami would continue to have total control of Titanium (the Public Company).

49. Ms. Carter later advised that Mr. Nezami would relinquish his control of and governance over all of the Private Companies other than Titan Partners Management, LLC and Titan Partners, LLC.

**B. The Transactions between the Four Entities and Nezami**

50. In 2014, the Four Entities negotiated and entered into a series of agreements with the Nezami Sellers, identified as the "Four Entities Agreements" (defined below in paragraph 55), pursuant to which the Nezami Sellers sold to the Four Entities membership interests in a number of limited liability companies purportedly owned at least in part by the Nezami Sellers (the "Subject Membership Interests"). The Subject Membership Interests included ownership interests in the following companies:

A. HealthScripts Specialty Pharmacy, LLC;

B. Global Molecular Labs, LLC;

C. Titan Genomix, LLC;

D. Healthlabs of America, L.L.C.;

E. HealthScripts Management Services, LLC;

F. In-Office Lab Management, LLC;

G. Titan Partners Management, LLC;

H. Pharmacy Affiliates of America, LLC;

I. Pharmacy Affiliates of Colorado, LLC;

J. Pharmacy Affiliates of Houston Galleria, LLC;

K. Pharmacy Affiliates of Indiana, LLC;

L. Pharmacy Affiliates of Missouri, LLC;

M.    Pharmacy Affiliates of North Texas, LLC;

N.    Pharmacy Affiliates of Oklahoma, LLC;

O.    Pharmacy Affiliates of Southwest Texas, LLC;

P.    Pharmacy Affiliates of Tennessee, LLC;

Q.    Pharmacy Affiliates of Texas, LLC;

R.    Pharmacy Affiliates of the Lone Star State, LLC, and;

S.    Pharmacy Affiliates of the Southeast, LLC.

The Pharmacy Affiliates, identified in sub-paragraphs H through S above, otherwise known as Physician Owned Pharmacies, are collectively referred to as the "POPS."

51.    The Nezami Sellers did not, in fact, own any equity interest in Global Molecular Labs, LLC, which was nevertheless included in the interests purportedly sold to the Four Entities. Following the disclosure of the fraud, Global Molecular Labs, LLC gifted interests in that company to the Four Entities.

52.    While Ms. Carter was aware of the fact that the Nezami Sellers did not own any equity interest in Global Molecular Labs, LLC, she nevertheless drafted the Four Entities Agreements to include the sale of an interest in Global Molecular Labs, LLC as a part of her continuing and active participation in the fraud being committed by the Nezami Sellers.

53.    Ms. Carter was also present when Mr. Nezami falsely represented to the Four Entities and others that Global Molecular Labs, LLC, would earn in 2014 net income in excess of $80.0 million. Ms. Carter knew that this representation was false and, as noted, that the Four Entities would have no ownership interest in that company

54.    Through the interests acquired, the Four Entities also acquired beneficial interests in other related entities. For example, through their interest in Titan Partners Management, LLC, the Four Entities acquired a beneficial interest in Titan Partners, LLC (Titan Partners

Management, LLC owns approximately 61% of Titan Partners, LLC). The Four Entities also, therefore, acquired a beneficial interest in Titanium (the Public Company) because Titan Partners, LLC, owns approximately 51% of Titanium.

55. The Agreements between the Four Entities and the Nezami Sellers included: (1) a Membership Interest Purchase Agreement dated as of March 12, 2014 between the Nezami Sellers and SES, with an addendum thereto dated as of March 13, 2014; (2) a Membership Interest Purchase Agreement dated as of March 24, 2014 between the Nezami Sellers and Mast; (3) two Membership Interest Purchase Agreements between the Nezami Sellers and GW, the first dated as of April 11, 2014, and a second dated as of May 21, 2014; and (4) a Membership Interest Purchase Agreement dated as of May 15, 2014 between the Nezami Sellers and Gansett (collectively, the "Four Entities Agreements"). (True copies of the Four entities Agreements and addenda thereto described in this paragraph are annexed hereto as **Exhibits A, B, C, and D**.)

56. In connection with the purchases described above, the Four Entities wired funds from New York and New Jersey to Texas to the Nezami Sellers, some of which were sent directly to the Nezami Sellers and some of which were sent to the Husch attorney trust account for the benefit of the Nezami Sellers, in the aggregate sum of $1,350,000 as follows and on the following dates:

    (a)    On March 14, 2014, SES wired the sum of $250,000;

    (b)    On March 26, 2014, Mast wired the sum of $250,000;

    (c)    GW wired the sum of $125,000 on April 9, 2014, and an additional $125,000 on May 19, 2014; and

    (d)    On May 16, 2014, Gansett wired the sum of $350,000. It wired an additional $125,000 on May 20, 2014, and a final payment of an additional $125,000 on May 27, 2014.

**C.    The Events Leading Up to the Four Entities' Purchases From the Nezami Sellers**

57.    In or about November, 2013, Mr. Plotkin was introduced to Mr. Nezami. Mr. Nezami and Mr. Plotkin discussed Mr. Plotkin's and others' (who would later be introduced to Mr. Nezami) potential investment in the Private Companies (which are specifically identified above in Footnote 1).

58.    Beginning in or about January, 2014, Mr. Nezami was introduced to individuals who became members of the Four Entities investing in the Private Companies through purchasing from the Nezami Sellers the respective interests in the Private Companies for the aggregate sum of $1,350,000. As a result of Plaintiffs' interests in Titan Partners, LLC, they became beneficial owners of equity interests in Titanium (the Public Company).

59.    Between the initial meeting in November 2013 and until the Four Entities ultimately wired the funds for their investments, at least 17 meetings took place in New York with New York investment banking firms, two private equity firms and one hedge fund, (collectively the "Investment Meetings").

60.    There were also numerous interstate telephone calls that Mr. Nezami, Ms. Carter, and others had with potential investors – telephone calls that were made to and from New York. For example, one of the Investment Meetings with a private equity firm was by an interstate phone call between Texas and New York.

61.    Ms. Carter, Mr. Nezami, Mr. Carman, and others who worked for the Private Companies and Titanium attended all or some of the meetings referred to in paragraph 59 and participated in some or all of the telephone communications in paragraph 60.

62.    Investment banking firms were being considered by Titanium to represent it in connection with an Initial Public Offering of shares of its common stock to the public that was to

take place at some time in the near future and to represent it on the up-listing of the company to the New York Stock Exchange. In addition, the investment banking firms were also being solicited for potential debt offerings, recapitalizations, private sales, and other transactions.

63. In addition to Mr. Nezami's soliciting of the investment banking firms, Mr. Nezami was introduced to two private equity firms for the purpose of seeking their purchase of interests in the companies.

64. The Investment Meetings were organized by the Managers of SES (Mr. Tobias) and of Gansett (Mr. Plotkin).

65. Messrs. Tobias and Plotkin collectively or individually attended all of the Investment Meetings.

66. Mr. Nezami introduced Ms. Carter at the Investment Meetings as a partner in Husch who has represented Mr. Nezami for over 10 years, as the person who Mr. Nezami relies on in all of his business dealings, and as the person who knows him better than anyone else. In addition, at certain of the Investment Meetings, Mr. Nezami asked Ms. Carter, "Diane, who is the most conservative person you know?" Ms. Carter in each instance responded, "You are Kam" (referring to Mr. Nezami).

67. False and misleading statements were made by Mr. Nezami at the Investment Meetings. Ms. Carter, knowing the statements were false, nonetheless actively supported Mr. Nezami in the making of those statements and otherwise failed to act in accordance with her legal obligations, including her obligations under the Texas Disciplinary Rules.

68. The Four Entities reasonably relied on the truthfulness of the representations Defendants and Mr. Nezami made at the Investment Meetings as well as the accuracy of the documents given to the Four Entities.

69.     In addition to the Investment Meetings attended by Mr. Nezami, Ms. Carter, Mr. Carman, and other representatives of the Private Companies and of Titanium, meetings were also held in New York with the investors in the Four Entities, during which meetings Mr. Nezami made false and misleading statements upon which the Four Entities relied. Ms. Carter knew that Mr. Nezami's statements were false when they were made but nevertheless actively supported Mr. Nezami in the making of those statements and otherwise failed to act in accordance with her legal obligation, including her obligations under the Texas Disciplinary Rules.

70.     There were also meetings held in Texas among representatives of the Four Entities, Mr. Nezami, representatives of the Private Companies, representatives of Titanium, and Ms. Carter (who participated by telephone) during which meetings Mr. Nezami made false and misleading statements upon which the Four Entities relied. Ms. Carter knew that Mr. Nezami's statements were false when they were made but nevertheless actively supported Mr. Nezami in the making of those statements and otherwise failed to act in accordance with her legal obligation, including her obligations under the Texas Disciplinary Rules.

71.     Relying on the false and misleading statements made by the Nezami Sellers with the assistance of Husch, the Four Entities made their investments in the Private Companies as detailed above.

72.     Even after the Four Entities made their investments, Mr. Nezami with the knowledge and consent of Defendants, continued his unlawful conduct by continuing to solicit the Four Entities for additional money. After receiving substantially all the funds from the Four Entities, on May 20, 2014, Mr. Nezami sought to obtain an additional $2.15 million from the Four Entities and from others that Mr. Nezami invited Mr. Plotkin to solicit (for a total of $3.5

million). In that regard, Mr. Nezami sought an additional $150,000 from the Four Entities (bringing their total investment to $1.5 million from the $1.35 million) and $2.0 million from other investors that Mr. Plotkin could be successful in soliciting, telling him, "We are growing at an exponential pace" and that the business was "booming and exploding. This is an opportunity of a lifetime." Mr. Tobias was also asked by Mr. Nezami to bring in additional investors above the $1.5 million. Mr. Nezami, in fact, asked Messrs. Plotkin and Tobias to raise an additional $50.0 million from private equity firms in exchange for ten percent of HSP, stating that the company is valued at $500 million as of in or about June 2014.

73.     Husch, through Ms. Carter and Mr. Carman, assisted Mr. Nezami's requests and solicitations for additional funds at the increased fraudulent valuation.

74.     Furthermore, representatives of the Four Entities, at the request of Mr. Nezami and with the knowledge and active participation of Ms. Carter, also raised monies through the solicitation of investors who purchased stock in Titanium, which efforts are continuing.

75.     Upon information and belief, with the knowledge of Ms. Carter, Mr. Nezami took a portion of those funds from the investors to pay to himself at least $15,000 per month, which was not disclosed to shareholders or others as required.

**D.      The Nezami Sellers and Defendants Fraudulent Use of
The Max Cure Foundation to Further Their Unlawful Scheme**

76.     In January 2014, Mr. Plotkin met with Mr. Nezami, Ms. Carter, and others in Baltimore, Maryland. During that meeting, Mr. Nezami and Ms. Carter were told about The Max Cure Foundation as Mr. Plotkin was learning about the business of HealthScripts Specialty Pharmacy, the other Private Companies, and Titanium.

77.     Before any of the Four Entities made any investments, the Nezami Sellers and Ms. Carter continued to learn about The Max Cure Foundation, ultimately leading to

Mr. Nezami's statement – made in the presence of Ms. Carter – that The Max Cure Foundation would be well taken care of and would not have to worry about funding going forward. Mr. Nezami discussed specifics as to what each of Mr. Plotkin and The Max Cure Foundation (through Mr. Plotkin) would receive, including having the Private Companies and Titanium become sponsors of The Max Cure Foundation.

78.     Mr. Plotkin did not attend certain of the Investment Meetings on February 6, 2014 because he was taping a segment for The Today Show, which was shown on NBC, nationally, on February 12, 2014 (see http://youtu.be/eC9hGSAyx1k) regarding The Max Cure Foundation. Nonetheless, Mr. Tobias was at the meetings not attended by Mr. Plotkin. The Four Entities relied on what Mr. Nezami stated and represented, with the concurrence of Ms. Carter, not only at the meetings referenced in this paragraph but also at all of the Investment Meetings.

79.     The Max Cure Fund was established at Memorial Sloan-Kettering Cancer Center (in New York City) in or about June, 2007 by Mr. Plotkin and his family in honor of his son, Maxwell, who was diagnosed with a rare form of cancer in early May, 2007. The purpose of The Max Cure Fund is to underwrite an Immune Cell Therapy Laboratory at the hospital (the "Lab"). The goal of the Max Cure Fund is to raise $5.0 million for the Lab. The purpose of the Lab is to treat children and young adults with cancer who do not respond positively to standard chemotherapy and radiation treatments to treat their cancers. After donating in excess of $250,000 through the Max Cure Fund to the Lab through December 31, 2008, The Max Cure Foundation was formed in December, 2008, both to continue to contribute funds to the Lab with the hope of reaching the $5.0 million goal and to expand the research mission to include family assistance (through the Roar Beyond Barriers program) and ultimately the mission of advocacy for children with cancer and their children.

80. After learning about The Max Cure Foundation at the January 2014 meeting, Mr. Nezami and Ms. Carter praised Mr. Plotkin for what he had accomplished by taking the "horror" of having a child with cancer and using that as motivation to form The Max Cure Foundation, making a positive contribution to the pediatric cancer cause. Mr. Nezami, in the presence of Ms. Carter, often told Mr. Plotkin that through the latter's investment in the Private Companies and in Titanium, it was Mr. Nezami's intention not only to financially assist Mr. Plotkin, but also to significantly financially assist The Max Cure Foundation so that it would not have to rely so heavily on donations from the Plotkin family as it continued its mission to underwrite the Lab and to help low income and military families battling cancer in their children. Mr. Nezami told Mr. Plotkin that he and the company make in one day what The Max Cure Foundation makes in one year.

81. Mr. Plotkin also discussed with Mr. Nezami and Ms. Carter what The Max Cure Foundation could do for the Private Companies and for what was then Titan Healthcare, Inc., which became Titanium. Mr. Plotkin explained a Max Cure Foundation program to Mr. Nezami and Ms. Carter, indicating that The Max Cure Foundation not only has contacts at Memorial Sloan-Kettering Cancer Center in New York City, where Max was treated, but also at hospitals throughout the country that were treating the children with cancer from the low income and military families in the program.

82. Mr. Nezami, Ms. Carter, and Mr. Plotkin also discussed how Mr. Plotkin's entrée (through The Max Cure Foundation) to hospitals and doctors around the country could benefit the Private Companies and Titanium by opening doors not otherwise available to them.

83. The fraudulent scheme perpetrated by Mr. Nezami, with the help of Husch (through Ms. Carter and Mr. Carman), is especially egregious because, in addition to the harm

inflicted on the Four Entities, the victims of Defendants' and the Nezami Sellers' unlawful scheme are the children with cancer and their families, seeking to, among other things, utilize The Max Cure Foundation to gain access to the doctors treating the children and the hospitals where the children are receiving treatment for their cancers.

**E.      Ms. Carter's, Mr. Carman's, Husch's, and the Nezami Sellers' Misrepresentations and Wrongful and Unlawful Conduct**

84.      In connection with the sale of the membership interests to the Four Entities, the Nezami Sellers on their own, as well as by and through and with the assistance of Ms. Carter, Mr. Carman, and Husch, made many material misrepresentations as well as substantial material omissions.

85.      In addition to knowing that Mr. Nezami was making and made false and misleading statements to the Four Entities and actively assisting him in the making of those false and misleading statements, Ms. Carter also knew during all times here relevant, among other things, that Mr. Nezami was "buried in debt," had tax liens and judgments filed against him in substantial amounts, had lawsuits pending against him, had lied by telling people relying on his integrity that he was in the Special Forces of the United States Military and was injured during a mission when a grenade went off in his presence, and had submitted to others his personal financial statements on which they were relying that were materially false.

86.      Further, Ms. Carter knew and actively participated in the meetings at which statements were made by Mr. Nezami that after Titanium is listed on the New York Stock Exchange, Mr. Nezami would buy the NFL football team known as the Jacksonville Jaguars, which statements were intended to demonstrate to the Four Entities that Titanium would be listed on the New York Stock Exchange.

87. However, Ms. Carter knew that given the structure of Titanium, which was included in the Agreements prepared by her for Titan Management Partners, LLC, and Titan Partners, LLC – with Mr. Nezami having total control of Titanium – the company would not be able to be listed on the New York Stock Exchange.

88. Husch, through Ms. Carter and Mr. Carman, also knew that with Mr. Nezami having such control, Titanium could not get Directors & Officers (D&O) insurance coverage or obtain independent directors.

89. On or about April 25, 2014, Ms. Carter and/or other lawyers at Husch drafted a Promissory Note and Security Agreement between Mr. Nezami and a creditor, giving that creditor a security interest in all of Mr. Nezami's interests in, among other things, the Private Companies. Attached hereto as **Exhibits E, F, and G** are true copies of the Promissory Note and Security Agreements drafted by Ms. Carter and/or other attorneys at Husch.

90. In making their investments in the Private Companies, the Four Entities reasonably relied on the misrepresentations and material omissions made by the Nezami Sellers, Husch, and Ms. Carter.

91. In the Four Entities' Agreements, which Ms. Carter and other lawyers at Husch drafted, Husch actively assisted and knowingly allowed the Nezami Sellers to falsely represent, among other things, that:

(a) "Seller has good, clear, valid, and marketable title to the Subject Membership Interest and has sole ownership, beneficial and of record, of such Subject Membership Interest, free and clear of all Encumbrances ..." For purposes of the Four Entities Agreements, "Encumbrances" was defined to include "any security interest, pledge, lien (whether or not filed or recorded and whether or not inchoate and whether or not perfected) ..."

(b) "Upon consummation of the transactions contemplated by this Agreement, Purchaser will obtain good and valid title to the Subject Membership Interest from Seller, free and clear of all Encumbrances."

-24-

(c)  "There are no actions suits, proceedings, investigations, or directives, pending or, to Seller's knowledge threatened or in process ..."

92.  Less than one month after drafting the Promissory Note and Security Agreement, discussed above, paragraph 89, Ms. Carter and other lawyers at Husch drafted certain of the Four Entities Agreements and included, among other things, the above false and misleading statements, knowing they were false at the time that they drafted the Agreements.

93.  The Four Entities Agreements contained Put Options that were clear on their face, but Mr. Nezami never intended to honor those options if exercised.

94.  Upon information and belief, Ms. Carter knew Mr. Nezami did not intend to honor the Put Options when she drafted (or had other lawyers at Husch draft) the Four Entities Agreements.

95.  When the Put Options were exercised on October 26, 2014, the Nezami Sellers refused to honor them and, instead, filed a Declaratory Judgment Action in the Texas State Court. That action is still pending.

96.  As such, the scheme of the Nezami Sellers, as assisted and actively participated in by Defendants, continues to cause damage to the Four Entities.

97.  The misrepresentations and material omissions made by the Nezami Sellers, with the active assistance and participation of Ms. Carter and Husch, include, but are not necessarily limited to, the following:

(a)  Ms. Carter prepared the April 25, 2014 Promissory Note and Security Agreement between Mr. Nezami and/or Nezami LLC and a creditor, copies of which are, as noted, attached hereto as **Exhibits E, F, and G**. Yet, less than one month later, Ms. Carter drafted and/or caused other lawyers at Husch to draft certain of the Four Entities Agreements that included the representations noted above in paragraph 90(a) and (b);

(b)  Ms. Carter, as a partner in Husch and as legal counsel to the Nezami Sellers, as of March 1, 2014, knew that Mr. Nezami had substantial tax liens filed against him by the United States Government, such tax liens being in excess of

$400,000. Yet, Ms. Carter drafted and/or caused other lawyers at Husch to draft the Four Entities Agreements that included the representations noted above in paragraph 90(a) and (b);

(c) Ms. Carter knew as of March 1, 2014, that Mr. Nezami had judgments filed against him of approximately $3.0 million. Yet, Ms. Carter drafted and/or caused other lawyers at Husch to draft the Four Entities Agreements that included the representations noted above in paragraph 90(a) and (b);

(d) Ms. Carter knew as of March 1, 2014, that there were lawsuits pending against Mr. Nezami claiming he owed monies to those respective plaintiffs. Yet, Ms. Carter drafted and/or caused other lawyers at Husch to draft the Four Entities Agreements that included the representations noted above in paragraph 90(c);

(e) There were ongoing investigations by the FBI, IRS, and Department of Homeland Security that, upon information and belief, were known by Ms. Carter to be pending. Yet, Ms. Carter drafted and/or caused other lawyers at Husch to draft the Four Entities Agreements that included the representations noted above in paragraph 90(c); and

(f) Ms. Carter knew that Mr. Nezami represented that he owned the equity interests being transferred to the Four Entities when, in fact, he did not own the interest in Global Molecular Labs, LLC. Yet, Ms. Carter drafted and/or caused other lawyers at Husch to draft the Four Entities Agreements that included the representations noted above in paragraph 90(a) and (b).

98. Ms. Carter knew as of March 1, 2014, that Mr. Nezami was telling third parties that he was in the United States military, having served in the Special Forces, and that the redness in his eyes and scars on his arm were due to his being injured while on a mission when a grenade went off in close proximity to where he was standing. Ms. Carter knew that Mr. Nezami had never been in the Special Forces and that his statement to that effect was not true.

99. Other misrepresentations and/or material omissions made by the Nezami Sellers, with the assistance and active participation of Ms. Carter, Mr. Carman, and other attorneys at Husch, include and relate to, but are not necessarily limited to:

(a) That Titanium could not and cannot obtain D&O Insurance, have an independent Board of Directors, or have its securities listed on public exchanges because Mr. Nezami controlled Titan Management Partners, LLC, which controlled Titan Partners, LLC, which, in turn, owned 51% of the stock in Titanium. Moreover, the relevant Operating Agreements for those two private

entities failed to provide for the removal of Mr. Nezami "for cause." Ms. Carter, and other attorneys at Husch knew these facts before any investments were made by the Four Entities and, indeed, drafted these underlying documents in such manner for the purpose of assisting the Nezami Sellers in their fraudulent scheme;

(b) Husch prepared the documents giving Mr. Nezami total control of Titan Partners Management LLC, which controlled Titan Partners LLC, owner of 51% of Titanium, and therefore knew of the impact of such provisions on Titanium. The Nezami Sellers, Ms. Carter, and other attorneys at Husch knew these facts before any investments were made by the Four Entities and, indeed, had prepared the documents in such manner so as to assist the Nezami Sellers in their fraudulent scheme;

(c) Starting in or about September 2013, Mr. Nezami diverted funds belonging to the Private Companies for his own use, using the companies as his personal "piggy bank" to live a lavish lifestyle filled with sports cars, planes, security details, and numerous homes, resulting as of May, 2014, in his having converted more than $1.2 million. Upon discovery of the embezzlement by Mr. Nezami, Ms. Carter said the funds taken by Mr. Nezami should be treated as "loans" or "draws" in an effort to cover up the theft. Moreover, she agreed that Mr. Plotkin and Mr. Tobias should not be told of the theft because such information if given to them would cause the companies to be destroyed. To further the cover up and assist in the fraud, Ms. Carter prepared two Promissory Notes, dated May 23, 2014, between certain of the Private Companies and Mr. Nezami, to cover up a portion of the theft of funds by Mr. Nezami, true copies of which are attached hereto as **Exhibits H and I**. Ms. Carter also participated in the decision to treat other of the stolen funds on the financial records of certain of the Private Companies as "loans or "draws" and participated in the decision not to show such "loans" or "draws" on the financial statements the Four Entities were given at the time they were deciding whether to invest in the Private Companies;

(d) After preparing the two fraudulent Promissory Notes, dated May 23, 2014, Ms. Carter asked that the Agreement entered into by Gansett be back-dated to May 15, 2014 (even though it was not signed until June of 2014) so that the agreement would pre-date the fraudulent Promissory Notes;

(e) Mr. Nezami's personal financial statements contained material misrepresentations as to his ownership in certain assets – among other things, he claimed he owned assets that were actually leased (*i.e.*, a 30,000 square foot home in Arizona, a ski home in Colorado, cars, planes, etc.). Ms. Carter knew these representations were false when they were made because, among other things, Ms. Carter drafted one or more Agreements for two of Mr. Nezami's friends to co-sign when Mr. Nezami bought an airplane because Mr. Nezami could not receive approval by himself based on his poor financial condition;

(f)     Mr. Nezami promised Ms. Carter a gift of an equity interest in Titan Partners, LLC (she would be a Class C member owning a 0.35% interest). Attached hereto as **Exhibit J** is a copy of a document showing the ownership interest promised to Ms. Carter;

(g)     The financial statements of the companies given to Mr. Plotkin and Mr. Tobias, and to the investment banking firms, private equity firms, and the hedge fund in New York City were false. Ms. Carter knew of their inaccuracies and misrepresentations and yet participated in the meetings and assisted Mr. Nezami in his sales pitch to potential investors. Indeed, the HSP financial statement for 2013 given to the Four Entities showed projected 2013 year-end net income of $8.5 million, when, in fact, the actual net income was approximately $4.5 million.

(h)     Mr. Nezami falsely represented that the net income of HSP for 2014 would be $120.0 million, putting a $500 million valuation on the company, making it appear to the Four Entities that their investments had significantly increased and would be returned based on the projections in 1 ½ years, which Mr. Nezami and Ms. Carter knew to be false. However, based on the actual distributions in 2014 and 2015, it will take 18 years to recover the Four Entities' investments provided the distributions continue in this regard. As of March 2015, distributions have ceased for an indefinite period of time because the company has described itself as insolvent;

(i)     In the presence of Ms. Carter and to her knowledge, Mr. Nezami fraudulently misrepresented that as of a particular date, 750 doctors had invested in Titanium when in fact the number was approximately 100 doctors. Even though she knew the representations to be false, Ms. Carter continued to assist Mr. Nezami in his solicitation of investors, including the Four Entities.

(j)     Mr. Nezami, with the knowledge of Ms. Carter and in furtherance of the fraudulent scheme, failed to advise the Four Entities that there was an over-distribution of more than $1.0 million to members of HSP in 2013 because the income on the financial statements reflected the receipt of co-pays at full value when Mr. Nezami and Ms. Carter knew that only a relatively small portion of the co-pays, if anything, would be paid and received. This resulted in the writing down of more than $1.0 million, which in turn resulted in investors (including the Four Entities) being asked in February 2015 to make a capital contribution in the aggregate sum of $1.0 million to HSP to reimburse the company for the amount of the distributions fraudulently made in 2013 to certain of the members (which did not include the Four Entities because they had not become members until 2014); and

(k)     The $1.0 million capital call referenced in the prior subparagraph substantiates the fraudulent misrepresentations made to the Four Entities regarding the financials involving HSP because the Four Entities were advised in that capital call that if they do not pay the monies requested to meet the call, their interest

would be diluted 80%, establishing the purported value of the company at $2.5 million, more than 95% lower than the asserted valuation fraudulently represented by Mr. Nezami, which he had so represented to the Four Entities less than nine months earlier.

100. As a result of, among other wrongful conduct, the discovery by the Private Companies that Mr. Nezami had stolen no less than $1.2 to $1.4 million from the Private Companies, Mr. Nezami agreed to relinquish all governance of certain of the Private Companies, except for Titan Management Partners, LLC, Titan Partners, LLC, and the POPS, after being asked to do so by the Private Companies. Husch prepared the documentation that effected such relinquishment of control over the Private Companies, knowing that Mr. Nezami was asked to do so in light of the discovery of his wrongful conduct of which Ms. Carter was fully aware and in which she participated as a partner in Husch. Ms. Carter and Husch thereby continued to aid and abet Mr. Nezami's wrongful conduct. Mr. Nezami nonetheless retained his total control over Titanium.

101. Mr. Nezami, with the knowledge and acquiescence of Ms. Carter, falsely advised the Four Entities that he was required to give up any governance over the Private Companies because he could not actively be involved in governing both the Private Companies and Titanium. Ms. Carter knew that this representation was false because she knew Mr. Nezami was required to give up such control over certain of the Private Companies as a result of the discovery in or about February, March or April, 2014, that Mr. Nezami had embezzled no less than $1.2 million to $1.4 million from the Private Companies.

102. Mr. Nezami, with the knowledge, encouragement, and assistance of Ms. Carter, asked Mr. Plotkin to locate an office in New York City for the Private Companies and for Titanium to continue the fraudulent scheme to wrongfully seek additional investors, especially those located in New York and surrounding areas. In April 2014, Mr. Nezami, together with

Mr. Tobias and Mr. Plotkin, toured approximately fourteen office buildings in New York City for the purpose of finding office space as part of the effort to target investors, private equity firms located in New York, and hedge funds also located in New York, and to further the fraudulent scheme.

103.    Upon information and belief, Ms. Carter knew and/or had reason to know, that Mr. Nezami had opened approximately 300 bank accounts to effectuate his fraudulent scheme, many of which were in banks located in Arizona.

**F.    Additional Notice to Husch of the Wrongful Conduct**

104.    Following the Investment Meetings, which Mr. Carman attended, Mr. Nezami told Husch that Mr. Carman was not to be involved in future meetings because he was "too conservative" and Mr. Nezami wanted "more aggressive attorneys."

105.    Upon information and belief, following Mr. Carman's removal from active participation in dealing with third parties being solicited by the Private Companies and Titanium, despite his continued involvement on, among other things, interstate e-mails and phone calls designed to further the Nezami Sellers' unlawful scheme, Mr. Carman raised concerns within Husch regarding his unfavorable perception of Mr. Nezami, including the active participation of Ms. Carter in what was of concern to Mr. Carman. Those concerns went unheeded by Husch, recognizing the financial contributions being made to Husch through the Nezami Sellers in the form of fees being generated. The actions of Ms. Carter were with the knowledge of (and her intent to aid and abet) the unlawful scheme. Mr. Carman's actions and his failure to act were in reckless disregard of what he knew or should have known was the unlawful scheme being perpetrated by Mr. Nezami and Ms. Carter.

106. Mr. Carman's and Husch's failure to address the fraudulent and wrongful activity of the Nezami Sellers, which Ms. Carter and Mr. Carman continued to aid and abet, was in reckless disregard of the harm that had been caused and was continuing to be caused to the Four Entities. Upon information and belief, Mr. Carman raised concerns with Husch regarding the unlawful scheme that went unheeded.

107. The actions and failures to act (omissions) of Ms. Carter complained of above were in furtherance of her performance of duties as a partner in Husch.

108. The actions and failures to act (omissions) of Mr. Carman complained of above were in furtherance of his performance of his duties as a partner in Husch.

## G.     Conspiracy among Husch, Ms. Carter, the Nezami Sellers, and Others

109. As described herein, each of Husch, Ms. Carter, the Nezami Sellers, and other unnamed individuals and entities participated in a common agreement, plan, and scheme related to the embezzlement of funds from the Private Companies and the fraudulent solicitation of investments from the Four Entities and others.

110. As described in more detail herein, each of Husch, Ms. Carter, the Nezami Sellers, and other unnamed individuals and entities were aware of the common agreement, plan, and scheme related to the embezzlement of funds from the Private Companies and the fraudulent solicitation of investments from the Four Entities and others and acted in concert with one another.

111. As described in more detail herein, each of Husch, Ms. Carter, the Nezami Sellers, and other unnamed individuals and entities committed overt acts in furtherance of the conspiracy at issue here. More specifically, Husch and Ms. Carter provided legal services to the Nezami Sellers while fully aware that the Nezami Sellers had made and continued to make false

representations to the Four Entities. Husch and Ms. Carter drafted Agreements containing materially false representations and drafted the Promissory Notes – and intentionally back-dated the Membership Interest Purchase Agreement dated as of May 15, 2014 between Nezami Sellers and Gansett. Husch and Ms. Carter also attended meetings with the Nezami Sellers and the Four Entities and knew about and acquiesced in the material misrepresentations the Nezami Sellers made to the Four Entities.

112.    The Nezami Sellers made numerous false, fraudulent misrepresentations to the Four Entities to induce them to invest in the Private Companies, stole money belonging to the Private Companies, and involved their attorneys to create an air of legitimacy to the fraudulent transactions the Nezami Sellers entered into with the Four Entities.

113.    Each of Husch's, Ms. Carter's, the Nezami Sellers', and other unnamed individuals' and entities' conduct and representations were intentional, knowing, and designed to defraud the Four Entities and others and to mask the unlawful scheme described herein.

## AS AND FOR A FIRST CAUSE OF ACTION
## (VIOLATIONS OF FEDERAL CIVIL RICO STATUTE / 18 U.S.C. § 1962(c))

114.    Plaintiffs repeat and re-allege each and every one of the foregoing allegations as though fully set forth herein.

115.    As alleged herein, Defendants aided and abetted the Nezami Sellers in their fraud and have violated the RICO statute by engaging in and continuing to engage in a concerted campaign to, among other things, fraudulently induce investors, such as the Four Entities, to invest in the Private Companies, embezzle monies invested by the Four Entities and others in the Private Companies as well as money held by or in Titanium.

116.    Defendants aided and abetted the Nezami Sellers in fraudulently soliciting the Four Entities to obtain additional funds from both the Four Entities and from third parties.

117. Defendants aided and abetted the Nezami Sellers in creating an enterprise by joining together for the purpose of soliciting investment monies intended to be embezzled and/or used for improper purposes, including, but not limited to, Mr. Nezami's personal use of such monies to live a lavish lifestyle filled with sports cars, planes, security details, and numerous homes. Each Defendant used the resources available to it and her to support the ongoing enterprise in its unlawful solicitation of investment proceeds from Plaintiffs and others and the continued embezzlement of such funds.

118. On two or more occasions, Defendants and the Nezami Sellers improperly and unlawfully through interstate e-mails and interstate telephone calls fraudulently solicited monies from, among others, the Four Entities, embezzled monies from the Private Companies and Titanium, consisting of, at least in part, monies invested by, among others, the Four Entities. The conduct, enterprise and scheme of Defendants working with Nezami Sellers is continuing.

119. Defendants and the Nezami Sellers lied to Plaintiffs and provided them with intentionally false information (including, but not limited to, false financial statements and other due diligence materials) to induce them to invest money in the Private Companies and in Titanium.

120. Defendants drafted Agreements that were presented to the Four Entities, by and through the use of interstate wire and mail communication, which they knew contained false and misleading statements. Defendants and the Nezami Sellers engaged in a cover-up of the embezzlement by Mr. Nezami. Defendants prepared investment and purchase documents and transmitted such documents through the use of interstate wire and mail communications.

121. Defendants also solicited Plaintiffs' investments and received such investments through interstate wire communications and transfers.

122.     Defendants and the Nezami Sellers also solicited the Four Entities to obtain additional investors to buy shares of Titanium and to invest in the Private Companies.

123.     The Four Entities reasonably and justifiably relied on the false representations made by Defendants and the Nezami Sellers.

124.     The Nezami Sellers used Husch and Ms. Carter to provide a purported air of legitimacy to the representations made during the Investment Meetings and otherwise, a role in which Ms. Carter actively participated, thereby aiding and abetting, as well as actively participating in the fraud being committed.

125.     As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.  Defendants are further entitled to treble damages and to their reasonable attorneys' fees and costs.

126.     Because Defendants' conduct as alleged herein was done knowingly, intentionally, willfully, maliciously, recklessly, and wantonly, Plaintiffs are entitled to punitive damages.

**AS AND FOR A SECOND CAUSE OF ACTION
(AIDING AND ABETTING FRAUD)**

127.     Plaintiffs repeat and re-allege each and every one of the foregoing allegations as though fully set forth herein.

128.     Defendants and the Nezami Sellers made numerous material misrepresentations and omissions of fact, as described above in detail.

129.     Each of Defendants and the Nezami Sellers knew that the misrepresentations and omissions detailed above were false, incomplete, and/or misleading.

130.     Defendants and the Nezami Sellers made and/or adopted the misrepresentations and omissions specifically to induce Plaintiffs to rely on such misrepresentations and omissions

in deciding to invest in the Private Companies and to provide additional monies to Defendants and/or the Nezami Sellers.

131.     Plaintiffs reasonably and justifiably relied on the numerous misrepresentations and omissions Defendants and the Nezami Sellers made and/or adopted in deciding to invest in the Private Companies and would not have made such investments had they known the falsity of the misrepresentations and omissions alleged and detailed herein.

132.     Defendants had actual knowledge that the misrepresentations and omissions made and/or perpetrated by the Nezami Sellers were false, incomplete, and misleading because they had specific information about Mr. Nezami's scheme to fraudulently induce investors, such as the Four Entities, to invest in the Private Companies and Titanium., They had specific information about Mr. Nezami's scheme to embezzle funds from the Private Companies and Titanium, they had specific information concerning the cover up of the theft of funds from the Private Companies, and they had specific information from the Nezami Sellers concerning the alleged scheme.

133.     Defendants provided substantial assistance to the fraud perpetrated by the Nezami Sellers because they participated in the meetings and telephone conversations, contributed to the sales pitches being made by the Nezami Sellers, prepared documents both with respect to Plaintiffs' purchases of their interests in the Private Companies and with respect to the purported loans made to the Private Companies intentionally designed to hide Mr. Nezami's theft.

134.     As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.

135.    Because Defendants' conduct as alleged herein was done knowingly, intentionally, willfully, maliciously, recklessly, and wantonly, Plaintiffs are entitled to punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
### (FRAUD)

136.    Plaintiffs repeat and re-allege each and every one of the foregoing allegations as though fully set forth herein.

137.    Defendants and the Nezami Sellers made numerous material misrepresentations and omissions of fact, as described in detail above.

138.    Each of Defendants and the Nezami Sellers knew that the misrepresentations and omissions were false, incomplete, and/or misleading.

139.    Defendants and the Nezami Sellers made and/or adopted the misrepresentations and omissions specifically to induce Plaintiffs to rely on such misrepresentations and omissions in deciding to invest in the Private Companies, to provide additional monies to Defendants and/or the Nezami Sellers, and in being asked to solicit additional third parties to invest in the Private Companies and/or in Titanium.

140.    Plaintiffs reasonably and justifiably relied on the numerous misrepresentations and omissions Defendants and the Nezami Sellers made and/or adopted in deciding to invest in the Private Companies and would not have made such investments had they known the falsity of the misrepresentations and omissions alleged and detailed herein.

141.    As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.

142. Because Defendants' conduct as alleged herein was done knowingly, intentionally, willfully, maliciously, recklessly, and wantonly, Plaintiffs are entitled to punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

143. Plaintiffs repeat and re-allege each and every one of the foregoing allegations as though fully set forth herein.

144. Defendants had a duty to Plaintiffs as established at Common Law and by the Texas Disciplinary Rules.

145. Contrary to their duty to Plaintiffs, Defendants made false, incomplete, and/or misleading statements, misrepresentations and omissions that Plaintiffs knew or should have known were incorrect, false, incomplete, and/or misleading.

146. Contrary to their duty to Plaintiffs, Defendants assisted, aided, and abetted the Nezami Sellers in making false, incomplete, and/or misleading statements, misrepresentations and omissions.

147. Defendants knew that Plaintiffs were and would be relying on Defendants' statements, misrepresentations, and omissions in determining whether to invest in the Private Companies and in soliciting third parties to invest in Titanium and/or the Private Companies.

148. Plaintiffs reasonably and justifiably relied on Defendants' misrepresentations and omissions in determining whether to invest in the Private Companies.

149. As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.

150. Because Defendants conduct as alleged herein was done knowingly, intentionally, maliciously, recklessly, and wantonly, Plaintiffs are entitled to punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
## (NEGLIGENT SUPERVISION)

151.    Plaintiffs repeat and re-allege each and every one of the foregoing allegations as though fully set forth herein.

152.    Ms. Carter and Mr. Carman were employed by and/or were partners in Husch, making Husch responsible for Ms. Carter's and Mr. Carman's actions taken during the course of their employment responsibilities as partners of the firm.

153.    Other partners and employees of Husch may have been involved in the wrongful conduct identified in This First Amended Complaint and if so, Husch had a duty to supervise them, as it had such a duty to supervise Ms. Carter and Mr. Carman.

154.    Consistent with its duty established at Common Law and by, among other things, the Texas Disciplinary Rules, Husch had and has a duty to supervise its partners and other employees who service clients on Husch's behalf not to make false and fraudulent representations towards those with whom the clients are dealing and to ensure that its partners and other employers do not assist its clients in committing fraud.

155.    Husch failed to satisfy its duty to supervise properly Ms. Carter, Mr. Carman, and potentially other partners and employees of the firm who were involved in the wrongful acts directed against Plaintiffs identified in this First Amended Complaint.

156.    Based on the information alleged herein, Husch knew or should have known about Ms. Carter's and Mr. Carman's misconduct (and the misconduct of perhaps other partners and employees of Husch) prior to such misconduct having proximately caused Plaintiffs' injuries alleged herein.

157. Ms. Carter's and Mr. Carman's misconduct (and the misconduct of perhaps other partners and employees of Husch) was committed during the course of their employment responsibilities as partners (or employees) of Husch.

158. As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages in an amount to be proven at trial.

159. Because Defendants conduct as alleged herein was done knowingly intentionally, maliciously, recklessly, and wantonly Plaintiffs are entitled to punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment as follows:

(a) On the First Cause of Action, compensatory and punitive damages (including treble damages) and attorneys' fees in an amount to be determined at trial but in no event less than $625,000,000;

(b) On the Second Cause of Action, compensatory and punitive damages in an amount to be determined at trial but in no event less than $625,000,000;

(c) On the Third Cause of Action, compensatory and punitive damages in an amount to be determined at trial but in no event less than $625,000,000;

(d) On the Fourth Cause of Action, compensatory and punitive damages in an amount to be determined at trial but in no event less than $625,000,000;

(e) On the Fifth Cause of Action, compensatory and punitive damages in an amount to be determined at trial but in no event less than $625,000,000;

(f) Attorney's fees, costs, and disbursements related to this action; and

(g)   Such other and further relief as the Court may deem just and proper.

Dated:    July 24, 2015

                                        Respectfully submitted,
                                        EPSTEIN, ARLEN & OSTROVE, LLC


                                        By: _____/s/ Elliot D. Ostrove_____
                                                Elliot D. Ostrove, Esq.

                                        220 Davidson Avenue, Suite 102
                                        Somerset, NJ 08873
                                        (732) 828-8600




## JURY DEMAND

        Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:    July 24, 2015


                                        Respectfully submitted,
                                        EPSTEIN, ARLEN & OSTROVE, LLC


                                        By: _____/s/ Elliot D. Ostrove_____
                                                Elliot D. Ostrove, Esq.

                                        220 Davidson Avenue, Suite 102
                                        Somerset, NJ 08873
                                        (732) 828-8600