UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – x

GANSETT ONE, LLC, SES WEALTH     :
ADVISORS, LLC, GW HOLDING, LLC, and   :
MAST AND SON, LLC,         :
         Plaintiffs,     :   15-CV-3551 (ALC)
    - against -        :
              :
HUSCH BLACKWELL, LLP, DIANE T. CARTER, :
JOHN DOES 1-10, JANE DOES 1-10, and ABC   :
CORPS. 1-10,          :
        Defendants.    :
              :

– – – – – – – – – – – – – – – – – – – – – – – – – x

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

**EPSTEIN, ARLEN & OSTROVE, LLC**
220 DAVIDSON AVENUE, SUITE 102
SOMERSET, NJ 08873
(732) 828-8600
ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .................................................................. 1

II.    FACTS ........................................................................................................ 3

III.    LEGAL STANDARD ................................................................................ 8

IV.    LEGAL ARGUMENT ............................................................................... 9

     A. The Complaint Sufficiently Pleads Fraud ........................................... 9

       i.   The Complaint Adequately Pleads Material Misrepresentations or
          Omissions ........................................................................................ 9

          a.   Carter Orchestrated a Cover-Up of Nezami's Theft of Funds from the
            Private Companies ................................................................... 10

          b.   Carter Bolstered Nezami's Misstatements at In-Person and
            Telephonic Meetings .............................................................. 11

          c.   Carter knew that the Agreements Contained False Representations .... 11

          d.   Defendants' Cases are Distinguishable and Support Plaintiffs'
            Claims ...................................................................................... 12

       ii.   The Complaint Adequately Pleads Scienter ...................................... 13

       iii.   Plaintiffs Relied on Defendants' Misrepresentations and Suffered Injury ....... 14

     B. The Complaint Sufficiently Pleads a Claim for Aiding and Abetting ........................... 15

     C. The Complaint Sufficiently Pleads RICO Violations Pursuant to
       18 U.S.C. §1962(c) .............................................................................. 16

       i.   The Complaint Adequately Pleads that Defendants Participated in the RICO
          Enterprise ........................................................................................ 16

       ii.   The Complaint Adequately Pleads a Continuing Pattern of Racketeering
          Activity ............................................................................................ 18

          a.   The Complaint Adequately Pleads an Open-Ended Pattern ................ 19

     D. The Complaint Sufficiently Pleads Negligent Misrepresentation ................................. 21

       i.   The Complaint Adequately Pleads that Defendants Owed Plaintiffs a Duty ... 22

          a.   Carter Owed a Duty to Plaintiffs Pursuant to the Texas Disciplinary Rules ...................................................................................................22

          b.   Defendants Had a Special Relationship with Plaintiffs ........................22

     ii.  The Complaint Adequately Pleads that the Information Provided by Defendants was Incorrect and Plaintiffs Reasonably Relied on the Information...........................................................................................................24

   E.  The Complaint Sufficiently Pleads Negligent Supervision ...........................................24

V.    CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Abdullah v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009) ............................................... 8

*Ashcroft v. Iqbal*, 129 S. Ct. 1939 (2009) .................................................................... 8

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 540 (2007) ............................................... 19

*Candle Company et al. v. Flanagan, et al.*, No. [], 2006 U.S. Dist. LEXIS 14928
(D. Conn. Mar. 31, 2006) ...................................................................................... 16, 17

*Capital Asset Mgmt., Inc. v. Satinwood*, 385 F.3d 159 (2d Cir. 2004) ...................... 17

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269
(2001) ............................................................................................................................... 9

*CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 2 (1st Dep't. 2010) .................... 22

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ........................... 15

*DiFolco v. MSNBC Cable, L.L.C.*, 622 F.3d 104 (2d Cir. 2010) ................................. 8

*Doehla v. Wathne Ltd. et al.*, No. 98-cv-6087, 1999 U.S. Dist. LEXIS 11787
(Aug. 3, 1999) ................................................................................................................ 22

*Fresh Meadow Food Svcs. LLC et al. v. RB 175 Corp.*, et al., 282 Fed. Appx. 94
(2d. Cir. 2008) .......................................................................................................... 19, 20

*Friedman v. Arizona World Nurseries Ltd. P'ship*, 730 F. Supp. 521 (S.D.N.Y. 1990) ........... 12

*Friedman v. Hartmann*, No. 91-cv-1523, 1994 US Dist. LEXIS 3404
(S.D.N.Y. Mar. 23, 1994) ..................................................................... 12, 14, 18, 21, 23

*Gregor v. Rossi*, 120 A.D.3d 447 (1st Dep't 2014) ................................................... 15

*Handeen v. LeMaire*, 112 F.3d 1339 (8th Cir. 1997) ................................................. 16

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229(1989) .................................... 19

*Houbigant, Inc. v. Deloitte & Touche LLP*, 303 A.D.2d 92 (App. Div. 1st Dep't 2003) ......... 13

*Jordan (Bermuda) Investment Co. v. Hunter Green Investments, Ltd.*, No. 00-cv-9214,
2003 US Dist. LEXIS 5182 (S.D.N.Y. Apr. 1, 2003) ................................................. 12

i

*JSC Foreign Econ. Ass'n Technostroyexports v. Weiss*, No. 06-cv-6095,
2007 U.S. Dist. LEXIS 28954 (S.D.N.Y. April 18, 2007) ............................ 17

*Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 163 (2d. Cir. 2007) ...................................... 8

*Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir. 1994) ........................................... 9

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ........................................... 8

*Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129 (S.D.N.Y. 2001).................. 9

*Marcus v. Frome*, 329 F. Supp. 2d 464 (S.D.N.Y. 2004) ...................................... 23

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 928 N.Y.S. 2d 229 (1st Dep't 2011) ...... 13

*Mezzonen, S.A. v. Wright*, No. 97-cv-9380, 999 U.S. Dist. LEXIS 17625,
(S.D.N.Y. Nov. 16, 1999) ...................................... 18

*National Westminster Bank USA v. Weksel*, 124 A.D.2d 144 (App. Div. 1st Dep't 1987)....... 12, 15

*Prudential Ins. Co. of America v. Dewey, Ballentine*, 80 N.Y.2d 377 (1992).......................... 22, 23

*Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478 (2007) ............................................ 9

*Stephenson v. PricewaterhouseCoopers, LLC*, 482 F. App'x 618 (2d Cir. 2012) ................... 9

*United States Fire Inc. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432
(S.D.N.Y. 2004)................................................................................. 17

*Vogt v. Greenmarine Holdings, LLC*, 318 F. Supp. 2d 136 (S.D.N.Y. 2004)........................... 8

*Weinberg v. Mendelow*, 113 A.D.3d 485 (1st Dep't 2014) ..................................... 13

**FEDERAL RULES OF CIVIL PROCEDURE**
Fed. R. Civ. P. 9(b)........................................................................... 8

Fed. R. Civ. P. 12(b)(6) ........................................................................ 8

**FEDERAL STATUTES**
18 U.S.C. §1962(c)............................................................................ 16

**TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT**
Tex. Disciplinary Rules of Professional Conduct, *Preamble* .................................... 22

Tex. Disciplinary R. 1.02(c) ................................................................... 22

Tex. Disciplinary R. 1.02(d) ........................................................................................ 22

Tex. Disciplinary R. 1.05(c)(7) .................................................................................... 22

Tex. Disciplinary R. 1.05(c)(8) .................................................................................... 22

Tex. Disciplinary R. 1.15(2) ........................................................................................ 22

Tex. Disciplinary R. 1.15(3) ........................................................................................ 22

Tex. Disciplinary R. 4.01(b) .................................................................................... 9, 22

Tex. Disciplinary R. 8.04 ............................................................................................. 22

# I.    PRELIMINARY STATEMENT

This brief is submitted on behalf of Plaintiffs in opposition to Defendants (collectively "Defendants"), motion to dismiss.

Using the credibility of the title "attorney" and backing that with the prestige of the Husch name, Carter was an integral part of a team that set out to defraud Plaintiffs and others in a wide-ranging fraudulent scheme that continues. That scheme involved not only Carter's active and knowing participation in the initial fraud, laid out in great detail in the Amended Complaint (hereinafter "Complaint"), but also her being a major player in the cover-up to hide from Plaintiffs the fraud that caused them to enter into the Purchase Agreements,[1] (hereinafter "Agreement") including the effort directed by Carter to cast the theft by Nezami of up to $1.4 million as loans and draws to him. That scheme, as to Plaintiffs specifically, started in September, 2013, and continues to this day and beyond. In that regard, the fraud of Husch and Carter includes, but is not limited to, a veritable laundry list of lies and deceptions (hereinafter referred to collectively as "Fraudulent Acts"), as follows:

1. Participating in communications with Plaintiffs, including attending meetings and supporting Nezami in the efforts to sell interests to Plaintiffs in the Private Companies and to obtain investors in Titanium and continuing to support those sales efforts from and after those communications and meetings even though:

   (a) Carter knew that Plaintiffs were given false financial statements and false projected financial statements, that the representations made to Plaintiffs that the statements were accurate were false, plus other information regarding finances of the companies that were likewise false (Plntfs' Am. Comp. at ¶¶ 15, 17, 18, 48, 53, 99(c), 99(g), 99(h), 99(j), 99(k));

   (b) Carter and others at Husch knew that Titanium would not be able to be listed on the New York Stock Exchange despite representations to the contrary by Nezami upon which Plaintiffs relied (*Id*. at ¶¶ 46, 86, 87, 88 99(a), 99(b));

---

[1] Terms defined in the Amended Complaint are incorporated herein by reference except "Purchase Agreements" are referred to as "Agreements".

(c) Carter knew that Nezami's representation that 750 doctors had invested in Titanium was false and that the correct number approximated 100 (*Id.* at ¶ 99(i));

(d) Carter knew that Nezami was lying to Plaintiffs when he told them, in her presence, that the redness in his eyes and scars on his arms were caused by his being injured by a grenade exploding when he was a member of the United States Special Forces – he was never in the military, not to mention the Special Forces (*Id.* at ¶¶ 85, 98); and

(e) Carter knew as of March 1, 2014 that Nezami was "buried in debt" and that his personal financial statements were false and contained material misrepresentations (*Id.* at ¶¶ 85, 99(e)).

2. Actively participating in the cover up of embezzlement from the Private Companies, Husch and Carter:

(a) Prepared fraudulent Promissory Notes from Nezami to cover up Nezami's theft of as much as $1.4 million from certain of the Private Companies, including the preparation on May 23, 2014, of fraudulent Promissory Notes from Nezami to HSP and HMS and otherwise participating with others at Husch's direction in covering up those thefts and characterizing them as loans and draws to Nezami (*Id.* at ¶¶ 7, 8, 13, 14, 99(c), 100, 101, Exhs. E, F);

(b) Participated in discussions between February and April, 2014, and beyond not to tell Plaintiffs of the theft of funds by Nezami, recognizing to do so would lead to the destruction of the companies ( *Id.* at ¶¶ 16, 99(c)); and

(c) Attempted to silence the person identified as the Potential Whistleblower whose life, with the knowledge of Carter, was threatened by Nezami (*Id.* at ¶¶ 22, 23, 48).

3. Drafted the Agreements that represented and warranted that the membership interests being sold were "free and clear" of Encumbrances, even though:

(a) Carter knew as of March 1, 2014, that Nezami had substantial judgments entered against him (about $3.0 million) (*Id.* at ¶¶ 85, 97(c));

(b) Carter knew as of March 1, 2014, that Nezami had tax liens filed against him in excess of $400,000 (*Id.* at ¶¶ 85, 97(b)); and

(c) Carter drafted a Promissory Note and Security Agreement dated April 25, 2014, giving Dr. Phelps a security interest in that which the Nezami Sellers had sold and were selling to Plaintiffs (*Id.* at ¶¶ 89, 97(a), Exhs. E, F, G).

4. Drafted the Agreements that represented as to the Nezami Sellers that there "are no actions, suits, proceedings, investigations, or directives, pending" even though:

(a) Carter knew as of March 1, 2014, that Nezami was a party to lawsuits against him claiming he owed monies to the plaintiffs in those lawsuits (*Id.* at ¶¶ 85, 97(d)); and

(b) Carter, upon information and belief, knew that there were ongoing investigations of Nezami by the FBI, IRS, and Department of Homeland Security (*Id.* at ¶97(e)).

5. Drafted the Agreements that represented, "Upon consummation of the transactions contemplated by this Agreement, Purchaser will obtain good and valid title," even though:

(a) Carter knew prior to preparing the Agreements the Nezami Sellers did not own an interest in Global Molecular Labs ("GML") (*Id.* at ¶¶ 51, 52, 97(f)).

A review of the Complaint leads inevitably to the conclusion that Carter and Husch were active participants in the scheme that Plaintiffs fell victim to and which continues even beyond the filing of the Complaint, and indeed, that Carter and Husch were leading players in the effort to cover up not only the fraud which caused Plaintiffs to execute the Agreements, but also the theft of funds by Nezami from the Private Companies. It is little wonder that Nezami offered Carter an equity interest in Titan Partners, LLC, which owns a 51% interest in Titanium, to compensate her for her support and participation in the fraudulent scheme (sometimes referred to as the "Offer of Equity") (¶¶ 21, 54, 99(f), Exh. J)). The Motion to Dismiss the Complaint should be denied in its entirety.

## II. FACTS

Plotkin was introduced to Nezami in or around November 2013 to discuss potential investment opportunities. *Id.* at ¶ 57. Beginning January 2014, Nezami had met other members of Plaintiffs, including Tobias,[2] and together, they began discussing the potential investment opportunities in the Private Companies. *Id.* at ¶ 58. During the January 2014 meeting, Nezami and Carter were told about the Max Cure Foundation ("MCF") as Plotkin was learning about the business of HSP and of the other Private Companies. *Id.* at ¶ 76. Nezami introduced Carter at the

---

[2] Plotkin is a Member of Gansett and Tobias is a Member of SES.

January meeting as his personal lawyer. *Id.* at ¶ 39. From the beginning, Carter was a part of the discussions, actively assisting the Nezami Sellers to convince Plotkin and thereafter, Tobias, to put together a group to purchase interests in the scheme that the Nezami Sellers were perpetrating. *See e.g. Id.* at ¶¶ 17, 20, 39, 53, 59, 60, 61, 66, 86. Playing every bit a leading role in a fraudulent scheme that specifically set out to defraud Plaintiffs and others, Carter attended those meetings not only to lend credence and credibility to the false and deceptive information being distributed by Nezami – information she knew to be false and deceptive at the time - but to also actively aid and abet the fraudulent scheme. *Id.* at ¶¶ 67, 69, 70.

Plotkin and Tobias set up at least 17 meetings that took place with New York investment banking firms, 2 private equity firms, and 1 hedge fund (collectively the "Investment Meetings"). *Id.* at ¶¶ 59, 62, 63. Plotkin and Tobias collectively or individually attended all of the Investment Meetings. *Id.* at ¶ 65. There were numerous interstate telephone calls between Nezami, Carter, and others with the potential investors. *Id.* at ¶ 60. At each of these meetings, Carter was not only in attendance but actively participated in the fraudulent scheme. *Id.* at ¶ 67. Nezami at the Investment Meetings made false and misleading statements that Carter, knowing the statements were false, actively supported. *Id.* Carman, another partner at Husch and a former member of the firm's Executive Board, and the liaison between the Texas office of Husch and Husch management located elsewhere, was also in attendance at some of the Investment Meetings. *Id.* at ¶¶ 44, 61, fn. 2 at 4.

Nezami repeatedly introduced Carter to representatives of Plaintiffs, and others at the Investment Meetings as his personal lawyer for over a decade, as the person who Nezami relies on in all of his business dealings, and as the person who knows him better than anyone else. *Id.* at ¶ 66. In addition, at certain of the Investment Meetings, Nezami asked Carter, "Diane, who is the

most conservative person you know?" Carter in each instance, in furtherance of the fraud, responded, "You are Kam" (referring to Nezami). *Id.* The purpose of sharing information about their relationship and Carter's attendance at and participation in the Investment Meetings was to lend credibility to Nezami and the investment opportunities he was selling, as well as to further the fraudulent scheme.

During this same period of time, as noted, it was discovered that since at least September 2013 Nezami had been stealing as much as $1.4 million from the Private Companies. In or about February, March, or April 2014, Nezami's embezzlement was discovered by the Private Companies and was disclosed to Carter. *Id.* at ¶¶ 11, 99(c), 101. Carter, working with others, devised a plan to recast the stolen funds as authorized loans to, and authorized draws by, Nezami from the Private Companies. *Id.* at ¶¶ 7, 8, 13, 14, 99(c), 100, 101, Exhs. E, F. As part of the plan to cover up Nezami's theft from the Private Companies, Carter, amongst other lawyers at Husch, drafted fraudulent Promissory Notes[3] and other supporting documents. *Id.* Taking things even further, Carter, knowing she was aiding and abetting Nezami's fraud upon Plaintiffs, participated in the decision not to tell Plaintiffs, and specifically, not only condoned but indeed directed the cover up of the fraud. *Id.* She participated in and condoned the directive, "Do not tell [Plotkin] or [Tobias] or the companies will be destroyed." *Id.* at 99(c). The Private Companies' financial statements with the knowledge of Carter, *see supra* pg. 1, were ultimately changed, without advising Plaintiffs, to reflect the false loans to and unauthorized draws by Nezami. Carter thereafter participated in the decision that the Private Companies provide Plaintiffs and other potential investors with the fraudulent financial statements. *Id.* After fraudulently covering up

---

[3] Defendants continue to "cover up" their treatment of Nezami's theft by glossing over any mention of the Promissory Notes in their Brief.

Nezami's theft, Carter continued to assist Nezami's fraudulent scheme and worked toward closing the deals.

Relying, at least in part, on the representations by Carter and the credibility the Husch name leant, Plaintiffs ultimately entered into several Agreements with the Nezami Sellers:

> (a) An Agreement dated as of March 12, 2014 between the Nezami Sellers and SES, with an addendum thereto dated as of March 13, 2014 (*Id.* at ¶¶ 50, 55, Exh. A);
>
> (b) An Agreement dated as of March 24, 2014 between the Nezami Sellers and Mast (*Id.* at ¶ 55, Exh. B);
>
> (c) Two Agreements between the Nezami Sellers and GW, the first dated as of April 11, 2014, and a second dated as of May 21, 2014 (*Id.* at ¶ 55, Exh. C).; and
>
> (d) An Agreement dated as of May 15, 2014 and signed in June, 2014 between the Nezami Sellers and Gansett (*Id.* at ¶ 55, Exh. D).

Carter and other lawyers from Husch drafted the Agreements – knowing they contained false statements and representations. *Id.* at ¶¶ 91, 97. For example, Carter and other lawyers from Husch, drafted a Promissory Note and Security Agreement, dated April 25, 2014, between Nezami and a creditor of Nezami, Dr. Phelps, giving Dr. Phelps a security interest in all of Nezami's interests in the Private Companies. *Id.* at ¶ 97(a), Exhs. E, F, G. Shortly thereafter, Defendants prepared the Agreements with, Gansett and GW,[4] which contained the following misrepresentations:

> "Seller has good, clear, valid, and marketable title to the Subject Membership Interest and has sole ownership, beneficial and of record, of such Subject Membership Interest, free and clear of all Encumbrances ..." For purposes of the Four Entities Agreements, "Encumbrances" was defined to include "any security interest, pledge, lien (whether or not filed or recorded and whether or not inchoate and whether or not perfected) ..." (*Id.*)

Defendants drafted and then presented Agreements to Plaintiffs representing that the Nezami Sellers were transferring their interests free and clear of any liens and/or judgments, that

---

[4] While the Agreements for SES and Mast, and the first Agreement, dated, April 11, 2014, with GW, predate the Security Agreement with Dr. Phelps, the Agreements were entered into in reliance on the many other instances of fraud by Defendants and Nezami. *Id.* at ¶¶ 123, 131, 140, 148.

there were no pending lawsuits, and there were no ongoing investigations, when they knew such representations were false. *See Id.* ¶¶ 85, 91(a), 91(c), 97. Defendants drafted Agreements which contained the following misrepresentation:

> "Upon consummation of the transactions contemplated by this Agreement, Purchaser will obtain good and valid title to the Subject Membership Interest from Seller, free and clear of all Encumbrances." (*Id.* at ¶¶ 91, 97)

Carter knew as of March 1, 2014, that Nezami was "buried in debt," had judgments filed against him of approximately $3.0 million, and was a defendant in various lawsuits. *Id.* at ¶ 97. Carter also knew as of March 1, 2014, that Nezami had substantial tax liens in excess of $400,000. *Id.* Defendants drafted Agreements which contained the following misrepresentation:

> "There are no actions suits, proceedings, investigations, or directives, pending or, to Seller's knowledge threatened or in process ..." (*Id.*)

Defendants also drafted the Agreements purporting to transfer to Plaintiffs an interest in GML. *Id.* The Nezami Sellers did not, in fact, own any equity interest in GML which Defendants knew at the time of the drafting. *Id.* at ¶ 97(f).

In connection with the Agreements, Plaintiffs wired funds from New York and New Jersey to Texas to the Nezami Sellers directly, or, were briefly held in Husch's trust account prior to being transferred to Nezami Sellers, as follows:

> (a) On March 14, 2014, SES wired the sum of $250,000 (*Id.* at ¶ 56);
> (b) On March 26, 2014, Mast wired the sum of $250,000 (*Id.*);
> (c) On April 9, 2014, GW wired the sum of $125,000 and an additional $125,000 on May 19, 2014 (*Id.*); and
> (d) On May 16, 2014 Gansett wired the sum of $350,000; an additional $125,000 on May 20, 2014 and an additional $125,000 on May 27, 2014 (*Id.*)

Carter directly benefited from aiding Nezami's fraud and covering up his misdeeds. Carter was to be given the Offer of Equity.[5] *Id.* at ¶¶ 21, 99(f), Exh. J. The fraudulent scheme

---

[5] Further, Nezami was a significant client of Carter's and Husch, resulting in substantial fees generated for the firm. Prior to the merger with Brown McCarroll, LLP, Husch, while performing its due diligence, it is believed, identified

continues in that additional investors are being sought relative to the Private Companies and Titanium and as to Plaintiffs, they continue to be injured as a result of Defendants' fraud relative to the Put Options and to being subject to capital calls and potential dilution of their interests. *Id.* at ¶¶ 93-96, 99(i), 99(k).

## II.    LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss should not be granted unless a complaint fails to plead any "factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1939, 1949 (2009). The complaint must be construed in the light most favorable to plaintiff, and draw all reasonable inferences in favor of plaintiffs." *Abdullah v. Pfizer, Inc.*, 562 F.3d 163, 169 (2d Cir. 2009).

When considering a motion to dismiss, a court "must accept as true all facts alleged in the complaint." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). The court's inquiry is limited to "the facts alleged in the complaint, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The court should not "weigh the strength of the evidence" but "simply consider [] whether the complaint alleges sufficient facts." *See Vogt v. Greenmarine Holdings, LLC*, 318 F. Supp. 2d 136, 144 (S.D.N.Y. 2004).

Allegations of fraud are governed by Rule 9(b), which requires plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To comply with this rule, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

Nezami and the companies in which he had equity interests as a substantial source of revenue. Nezami was a significant client of Defendants' Texas office.

Nonetheless "courts should not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001).

## III.    LEGAL ARGUMENT

> In the course of representing a client a lawyer shall not knowingly: (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party . . . knowingly assisting a fraudulent act perpetrated by a client.
> Tex. Disciplinary R. 4.01(b).
> A lawyer must not allow fidelity to a client to become a vehicle for a . . . fraud being perpetrated by that client. Consequently a lawyer *must* disclose a material fact to a third party if the lawyer knows that the client is perpetrating a . . . fraud and the lawyer knows that disclosure is necessary to prevent the lawyer from becoming a party to that crime or fraud.
> Tex. Disciplinary R. 4.01(b), cmt. 3. (emphasis added).

### A.  The Complaint Sufficiently Pleads Fraud

The elements of a claim for fraud are that: (1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss. *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), (internal quotations omitted) (quoting *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (2007)); *see also Keywell Corp. v. Weinstein*, 33 F.3d 159, 163 (2d Cir. 1994); *see also Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011).

### i.  The Complaint Adequately Pleads Material Misrepresentations or Omissions

Defendants try to negate the substantial role Carter and Husch played in the fraudulent scheme by trying to tell a story of a lawyer sitting at her desk merely documenting a client's deals. Carter, however, was not that lawyer. While she ultimately did document the deal, she did so only after participating in many meetings, e-mail exchanges, and phone calls, wherein she made,

adopted, and endorsed a plethora of false and misleading statements. In painstaking detail, laid out in 159 paragraphs, Plaintiffs have unfolded a fraudulent scheme, participated in by Carter as a partner at Husch. This scheme was made and endorsed by Defendants. Indeed, it was Carter that directed the cover up to conceal from Plaintiffs the embezzlement of funds by Nezami, including the direction that the theft be characterized as loans and draws.

The Complaint pleads ample facts showing that Carter was an active participant in the fraudulent scheme and that Defendants made false statements in support of that scheme. Defendants nonetheless inexplicably and erroneously argue that the Complaint does not allege that Defendants made affirmative representations. There are no cases that state a lawyer *can* commit fraud. Indeed, the court distinguishes the facts of each case cited by Defendants contrasting situations where lawyers were involved in the fraud. *See* discussion *infra*, at 12, section (d).

a. Carter Orchestrated a Cover-Up of Nezami's Theft of Funds from the Private Companies

In February, March, or April 2014, members of the Private Companies discovered that Nezami had embezzled as much as $1.4 million. Consulting Carter and at her direction the decision was made to cover up the theft by recasting the stolen funds as loans and authorized draws. Carter endorsed the plan and, in furtherance of the cover up, drafted at least two Promissory Notes, each dated May 23, 2014. Carter also participated in conversations wherein it was agreed to not tell Plotkin or Tobias of the theft and endorsed withholding that information from them. Defendants gloss over this sequence of events and cite case law that is inapposite. *See* discussion *infra*, at 12, section (d).

### b. Carter Bolstered Nezami's Misstatements at In-Person and Telephonic Meetings

From the moment Nezami was introduced to Plotkin in November 2013 through the time Plaintiffs had completed the wire of funds and signed the Agreements in June 2014 to invest in the Private Companies, Carter participated in the in-person and telephonic meetings to solicit Plaintiffs and other potential investors. At each meeting, including the 17 Investment Meetings in New York, Carter verified Nezami's false statements and played an active role in the fraudulent "dog and pony show." Additionally, Carter was included on e-mail communications (between Texas, New York, and New Jersey) between Plaintiffs and the Nezami Sellers. Carter adopted and fully supported the false misrepresentations made by Nezami.

The Complaint adequately alleges that Defendants participated in meetings with Nezami, knowing that the statements and representations made by him were false and were made to encourage Plaintiffs to enter into several Agreements. *See e.g.* ¶¶ 91(a) – (c). Nezami in holding out Carter as his personal lawyer for over 10 years, affirming he does not finalize any business deals without consulting her; that she "runs his life"; and that Carter knows him better than anyone else, took advantage of the credibility that Carter, as a partner, and the Husch name lent. Carter was actively involved in the fraudulent scheme from day one. At no point, as suggested by Defendants, was Carter simply behaving as "just Nezami's lawyer."

### c. Carter knew that the Agreements Contained False Representations

Carter, and other lawyers at Husch, drafted Agreements between the Nezami Sellers and Plaintiffs, knowing that the Agreements contained false representations and otherwise actively participated in the fraud that is here defined as the Fraudulent Acts, *supra* at 1-3.

d. Defendants' Cases are Distinguishable and Support Plaintiffs' Claims

Indeed, Defendants continue to try to distract the Court with their assertion that lawyers cannot be liable for their participation in a fraudulent scheme and the misrepresentations it drafts in a contract. Dfnts' Mem. at 17. As previously noted there is no authority that lawyers are immune from fraud claims. Defendants' citations are each distinguishable from the facts at hand. (*Jordan (Bermuda) Investment Co. v. Hunter Green Investments, Ltd.*, (No. 00-cv-9214, 2003 U.S. Dist. LEXIS 5182, at *6-28 (S.D.N.Y. Apr. 1, 2003) (in a securities case, declining to find Plaintiff's Second Amended Complaint alleged sufficient facts for a claim of fraud against the lawyer because there were no allegations that the attorney had any involvement in decision-making or that the documents were false and would be used for any improper purpose); *see also Friedman v. Arizona World Nurseries Ltd. P'ship*, 730 F. Supp. 521, (S.D.N.Y. 1990 (dismissing a securities 10(b) claim because the plaintiff alleged that the attorney merely drafted a memorandum). These are not the facts at hand. Carter was *not* a bystander. Carter was not just a lawyer who drafted contracts. Carter participated in the Nezami Sellers business dealings. She was an active participant in the Nezami Sellers' fraudulent scheme. *See also* the following cases cited by Defendants, which at the identified pages support Plaintiffs' claims. *See Friedman v. Hartmann*, No. 91-cv-1523, 1994 U.S. Dist. LEXIS 3404, at *9, 12, 13, (S.D.N.Y. Mar. 23, 1994); *Jordan (Bermuda) Investment Co.*, 2003 U.S. Dist. LEXIS 5182, at *27, 29, 30 (finding that if the defendant attorney had performed any act beyond preparing the drafts of the supplement to the subscription agreement" and "forwarded its client's statement to counsel for the Trust," plaintiff would have adequately pled a cause of action for fraud); and *Arizona World Nurseries Ltd. P'ship*, 730 F. Supp. at 533-34. *See also National Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 147 (App. Div. 1st Dep't 1987) (concluding that plaintiff would have

adequately pled fraud had it alleged facts "permitting the inference that defendant law firm knew of or intended to aid its client in the commission of a fraud.").

ii.        The Complaint Adequately Pleads Scienter

A plaintiff may satisfy the scienter requirement by showing a "rational basis" to infer that a defendant knowingly made a misrepresentation. *Houbigant, Inc. v. Deloitte & Touche LLP,* 753 303 A.D.2d 92, 98 (App. Div. 1st Dep't 2003). "The element of scienter ...is, of course, the element most likely to be within the sole knowledge of the defendant and least amenable to direct proof." *Id.* The Appellate Division recently cautioned that, although a plaintiff must detail the allegedly fraudulent conduct, "that requirement should not be confused with unassailable proof of fraud." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 928 N.Y.S.2d 229, 234 (1st Dep't 2011). Here, however, it is submitted that even at the pleading stage, Plaintiffs presented "unassailable proof of fraud" by Carter as a Husch partner.

Defendants cherry-pick a single paragraph (*See* ¶ 39) from the Complaint to support their argument that Plaintiffs have not sufficiently alleged scienter. Defendants continue to ignore the degree to which Carter supported Nezami, assisting him in his scheme. As discussed above and detailed throughout the Complaint, Carter and Husch supported the fraudulent scheme, participated in meetings and lent credibility to false statements, participated in and indeed directed the cover up of Nezami's theft, provided Plaintiffs with false information and drafted Agreements that they knew contained false representations. Plaintiffs have sufficiently pled facts that give rise to a fraudulent intent. (*See Weinberg v. Mendelow*, 113 A.D.3d 485, 488 (1st Dep't 2014) (allegations that defendant "knew, or . . . should have known" are sufficient when coupled with specific allegations of knowledge of fraud.")

*Friedman v. Hartmann*, cited by Defendants at 18, establishes that the Complaint demonstrates the requisite scienter. No. 91-cv-1523, 1994 U.S. Dist. LEXIS 3404 (S.D.N.Y. Mar. 23, 1994). There, plaintiffs entered into a Purchase Agreement for commercial real estate properties. *Id.* at *2-3. The defendant - attorney drafted the "Commission Agreement," providing a $1 million brokerage commission to a particular broker. The same attorney then drafted and presented a "Purchase Agreement" for the parties to sign. The Purchase Agreement expressly represented that there were no other brokers other than those that were listed that would receive a commission, failing to identify the broker in the Commission Agreement. *Id.* at *3-4. The Court concluded that the complaint adequately alleged scienter to support a claim for fraud against the attorney and her law firm because there was a sufficient basis to infer the attorney's knowledge and participation in the fraudulent scheme. The Court noted that because the attorney drafted the Commission Agreement, and is alleged to have drafted the Purchase Agreement, she was aware that the Purchase Agreement misrepresented the existence of the "Commission Agreement." *Id.* at *7. Similar to plaintiffs in *Friedman*, Plaintiffs here have more than sufficiently alleged scienter. *See* the Fraudulent Acts, *supra*, at 1-3. Carter's knowledge and participation in the fraudulent scheme is alleged in great detail throughout the Complaint.

      iii.    Plaintiffs Relied on Defendants' Misrepresentations and Suffered Injury

Plaintiffs reasonably and justifiably relied on the numerous misrepresentations and omissions Defendants made and/or adopted in deciding to invest in the Private Companies and would not have made such investments or otherwise attempted to interest others in investing in the Private Companies and Titanium had they known the falsity of the misrepresentations and omissions. As a result Plaintiffs have suffered injury.

## B. **The Complaint Sufficiently Pleads a Claim for Aiding and Abetting**

To state a claim for aiding and abetting fraud, a plaintiff must plead facts showing a) the existence of fraud; b) defendant's knowledge of the fraud; and c) that the defendant provided substantial assistance to advance the fraud's commission. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).

Contrary to Defendant's assertions, Carter was not "providing routine legal services" as the cases cited by the Defendants suggest. Dfnts' Mem. at 21. Carter was part of Nezami's team and a knowing participant in the fraud. Further, Defendants' cite to *Gregor v. Rossi* et al., 120 A.D.3d 447, 448 (1st Dep't 2014), is factually distinguishable. In *Gregor*, the complaint was deficient because plaintiffs failed "to allege that [the attorneys] had actual knowledge of the fraud and provided substantial assistance in its commission." *Id.* at 448. Here, it is alleged throughout the Complaint that Defendants had actual knowledge and actually participated in the fraud. *See Gregor*, 120 A.D.3d 447 at 448 (finding that if plaintiffs had specifically alleged they "made any of their investments after interacting with [the attorneys]", and further, alleged that "defendants had actual knowledge of the fraud and provided substantial assistance in its commission," plaintiffs would have successfully pled a cause of action for aiding and abetting the fraud); *see also National Westminster Bank USA*, 124 A.D.2d 144 (finding that plaintiff had not adequately alleged a claim for aiding and abetting where the "only assistance fairly alleged by plaintiff is that of the law firm's nondisclosure"). Here, Carter not only knew of the fraud, but actively aided and abetted the fraudulent scheme, including directing the manner in which the theft by Nezami of up to $1.4 million be hidden.

Beginning September 2013, Nezami stole as much as $1.4 million from the Private Companies. The theft by Nezami was discovered by the Private Companies and disclosed to

Carter at that time. Defendants agreed with others to treat the stolen $1.4 million as loans to Nezami and as authorized draws to him by the companies. Carter directed the cover up of the theft of funds and indeed, participated in the direction, "Do not tell [Plotkin] or [Tobias]." In order to cover up the theft, Husch prepared the Promissory Notes falsely reflecting loans to Nezami from two of the companies and knowingly participated in mischaracterizing in the financial statements the theft as loans or draws to Nezami.

In addition to knowingly and actively covering up of the theft, Defendants also made other affirmative misrepresentations and actively participated in the fraud. *See supra* at 9-10. The Complaint raises many acts, and failures to act, that demonstrate that Defendants actively aided and abetted and participated in the fraudulent scheme to advance the interests of Nezami Sellers and also advancing their own interests. *See* those acts identified as Fraudulent Acts, *supra*, at 1-3. For her part, Carter received the Offer of Equity, *supra*, at 3, in addition to the fees due Husch, for aiding and abetting the fraudulent scheme. The Complaint surely meets the pleading requirements for aiding and abetting.

**C. The Complaint Sufficiently Pleads RICO Violations Pursuant to 18 U.S.C. §1962(c)**

Section 1962(c) of the RICO statute provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct through a pattern of racketeering activity.

> i.    The Complaint Adequately Pleads that Defendants Participated in the RICO Enterprise

> "An attorney's license is not an invitation to engage in racketeering, and a lawyer no less than anyone else is bound by generally applicable legislative enactments [including RICO.] *See Candle Company, et al. v. Flanagan, et al.*, 2006 U.S. Dist. LEXIS 14928, *26-27 (D. Conn. Mar. 31, 2006) *quoting Handeen v. LeMaire*, 112 F.3d 1339, 1349 (8th Cir. 1997).

Defendants satisfy the direction and control test established under *Reves v. Ernst & Young*, 507 U.S. 170 (1993). The "operation or management test" requires a showing that each defendant played "some part in directing the enterprise's affairs." *Capital Asset Mgmt., Inc. v. Satinwood*, 385 F.3d 159, 176 (2d Cir. 2004). This test is a "relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Id. See JSC Foreign Econ Ass'n Technostroyexports v. Weiss*, No. 06-cv-6095, 2007 U.S. Dist. LEXIS 28954, at *28 (S.D.N.Y. April 18, 2007) ("*Reves* provides no blanket immunity for professionals regardless of their involvement in a criminal enterprise.") *Reves* is satisfied by pleadings alleging that defendants "were key participants, by making critical misrepresentations, creating false documents, and . . . serving as the point of communications." *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004).

In *Candle Company*, the Court addressed whether a jury's verdict that a lawyer/law firm were guilty of RICO violations should be overturned. No. 3:01-cv-531, 2006 U.S. Dist. LEXIS 14928 (D. Conn. Mar. 31, 2006). The defendants, lawyer/law firm, schemed to recharacterize a co-defendant's funds and therefore to defraud creditors. The Court concluded that because the lawyer/law firm advised the co-defendant to recast the proceeds as wages, (and therefore exempt from the execution of judgment), even though the proceeds were appropriately 1099 income, was "conduct reaching beyond the furnishing of advice and constitutes decision making for the enterprise, or, at the very least the knowing implementation of decisions designed to defraud the plaintiffs." *Id.* 2006 U.S. Dist. LEXIS 14928, at *32.

Here, Defendants participated in meetings and supported Nezami's false statements. Defendants directed the cover up of Nezami's theft and drafted false Promissory Notes as a means to further that cover up. Defendants also participated in the decision to not tell

Plotkin and Tobias about the stolen funds and to continue to provide false financial information. Furthermore, Defendants drafted the Agreements that they knew contained false representations – all with the goal of furthering the fraudulent scheme. *See also*, Fraudulent Acts, *supra*, at 1-3.

Additionally, Carter drafted Put-Options in the Agreements. Plaintiffs had up to 18-months following the effective dates of the Agreements to exercise these options to receive back their original investments. Nezami intended to bilk Plaintiffs out of their investment from the beginning and indeed, never intended to comply with the Put-Options to return the investments. Carter was aware that Nezami, who she knew was "buried in debt" and had judgments against him and with lawsuits pending, had no intention to return the investments and despite this knowledge, actively participated in the fraudulent scheme when she nevertheless drafted the Agreements to include the Put Options knowing that Nezami had no intention of abiding by those options if exercised. Plntfs' Am. Comp. at ¶¶ 93-96.

ii.    The Complaint Adequately Pleads a Continuing Pattern of Racketeering Activity

The use of interstate mail in furtherance of the enterprise can be shown by "a master plan to defraud, . . . a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communication." *See Mezzonen, S.A. v. Wright*, No. 97-cv-9380, 999 U.S. Dist. LEXIS 17625, at *23 (S.D.N.Y. Nov.16, 1999). Defendants incorrectly assert that "the pattern analysis here must begin by divining the exact predicate acts on which Plaintiffs rely, and when those predicate acts occurred." Dfnts' Mem. at 10. "To satisfy the elements of mail fraud, 'the mailings themselves need not contain misrepresentations, nor must they contribute directly to the deception of the Plaintiffs.' . . .Rather, the mailings must merely be 'incidental to an essential part of the scheme." *See Friedman*, 1994 U.S. Dist. LEXIS 3404, at *11-12 (internal citations omitted).

Plaintiffs have noted instances of interstate mail communications, specifying the sender and/or recipients; the general dates; and the general contents. Plntfs' Am. Comp. at ¶¶ 17, 60, 70. Plaintiffs are not required to attach every e-mail or envelope between itself and others. The allegations and not the proofs are relevant at this stage of the pleadings. *See Bell Atlantic Corp v. Twombly*, 550 U.S. 540, 556-57 (2007) (it is improper to dismiss a complaint because the court is doubtful the plaintiff will be able to prove allegations therein. "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof . . . is improbable, and that a recovery is very remote and unlikely.") This is not the case here where the allegations are detailed and if proven, substantiate that Defendants were active participants in the fraud.

### a. The Complaint Adequately Pleads an Open-Ended Pattern

The Complaint establishes a continuing pattern of racketeering activity. (*See Fresh Meadow Food Svcs. LLC et al. v. RB 175 Corp.*, et al., 282 Fed. Appx. 94, 99 (2d. Cir. 2008). "*A fact specific* inquiry, open-ended continuity may inhere in racketeering acts themselves, . . . as in a gangster's demand for regular 'protection' money, or in the fact that the acts are part of an ongoing entity's regular course of business." (emphasis added) (internal citations omitted)). Indeed, a plaintiff need only prove that there was a threat of continuing criminal activity beyond that period during which the predicate acts were performed. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242-43 (1989).

In *Fresh Meadows*, the Second Circuit concluded that plaintiffs had alleged sufficient facts to allege open-ended continuity. 283 Fed. Appx. at 100. In that case, defendant had fabricated an affidavit to conceal underground storage tanks ("UST"), among other offenses. *Id.* at 99. Upon discovery of the USTs, plaintiffs paid to remove the USTs. *Id.* at 96. Defendant asserted that the complaint failed to plead open-ended continuity because the alleged pattern was

necessarily terminated by the excavation and removal of the USTs. *Id.* at 100. The Second Circuit disagreed and held that the environmental hazards do not necessarily end when the USTs are removed. *Id.* In the matter before this Court, Defendants assert that once Nezami was caught stealing funds and Carter orchestrated the repayment plan, the fraudulent scheme was over. Defendants are wrong. As in *Fresh Meadows*, Nezami's embezzlement is just one piece of a broader puzzle that continues. There are continuing repercussions as more fully set forth below. This Court should not be distracted, as the Defendants have asserted, by a single act.

The Complaint adequately and sufficiently demonstrates that Defendants engaged in an ongoing criminal enterprise that began when Nezami purchased the predecessor to Titanium out of bankruptcy, and continues. For example, with the assistance of Defendants:

- Even after Plaintiffs made their investments, totaling $1.35 million, Nezami, with the knowledge, consent, and assistance of Defendants, continued the unlawful conduct by continuing to solicit Plaintiffs for additional money. Nezami, asked Plotkin and Tobias to solicit an additional $150,000 from current investors; an additional $2.0 million from additional investors; and to raise an additional $50.0 million from private equity firms in exchange for ten percent of HSP, falsely stating that the company is valued at $500 million as of in or about June 2014. (Plntfs' Am. Comp., ¶ 72.)

- Defendants and Nezami Sellers also solicited Plaintiffs to obtain additional investors to buy shares of Titanium and to invest in the Private Companies. (*Id.* at ¶ 114.)

- Nezami, with the knowledge and encouragement of Carter, asked Plotkin to locate an office in New York City for the Private Companies and for Titanium. In April 2014, Nezami, together with Tobias and Plotkin, toured approximately 14 buildings in New York City for the purpose of finding office space as part of the effort to target investors, private equity firms located in New York, and hedge funds also located in New York, and to further the fraudulent scheme. (*Id.* at ¶ 102.)

- Nezami, Carter, and Plotkin also discussed how Plotkin's entrée through MCF to hospitals and doctors around the country could benefit the Private Companies and Titanium by opening doors not otherwise available to them. (*Id.* at ¶ 82.)

- Nezami, with the knowledge and participation of Defendants, did not intend to stop his fraudulent behavior with Plaintiffs. Nezami never intended, with the knowledge of Carter, to abide by the terms of the Put Options, with his having sued Plaintiffs in Texas State Court regarding that issue, which case is pending. (*Id.* at ¶¶ 93-96.)

- Plaintiffs, in February 2015, received notices that additional funds were needed through capital contributions or their interests in HSP would be reduced. This request was preceded by the scheme whereby the income and assets of HSP were falsified. (*Id.* at ¶¶ 99)(i), 99(k).)

There was and is therefore a threat of continuing criminal activity. *See Friedman*, 1994 U.S. Dist. LEXIS 3404, at *13-14 (finding plaintiffs had satisfactorily demonstrated a pattern where they had made five separate payments and surely further payments were envisaged). The lawyer/law firm denied RICO liability on several bases, among which, the lawyer/law firm argued it was not liable because the plaintiffs failed to plead a pattern of racketeering activity. The court disagreed. The court found that because plaintiffs had entered into a partnership and made five payments constituting an investment in the partnership, clearly future payments were envisaged. *Id.* Compare these facts, among others, to the capital calls and dilution issues described above.

Here, Plaintiffs similarly were asked to solicit doctor-investors and did seek and obtain others to invest. Such solicitations by others are continuing. Similar to *Friedman,* future payments were envisaged. Plaintiffs, as noted, were also asked to make additional payments through the capital call, reference above. The potential exists for additional capital calls in the future with potential dilution of their interests. Plaintiffs have more than adequately pled a pattern of open-ended continuity based on the representations above.[6]

### D. The Complaint Sufficiently Pleads Negligent Misrepresentation

To state a claim for negligent misrepresentation a plaintiff must allege "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on that

---

[6] Even if the Court determines that a close-ended pattern is more appropriate in this case, Plaintiffs' have sufficiently alleged enough materials facts to continue discovery to further determine the extent of Nezami's and Defendant's ongoing criminal enterprise.

information." *See CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 2, 6 (1st Dep't. 2010).

    i.   The Complaint Adequately Pleads that Defendants Owed Plaintiffs Duty

        a.   Carter Owed a Duty to Plaintiffs Pursuant to the Texas Disciplinary Rules

"A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice. Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct." Tex. Disciplinary Rules of Professional Conduct, *Preamble*. Carter's active participation in the fraudulent scheme was in direct violation of the duty created to third-parties by Texas Disciplinary Rules, included but not limited to, 1.02(c), (d), and 1.05(c)(7) and (8), 1.15(2) and (3), 4.01(b), and/or 8.04)

        b.   Defendants had a Special Relationship with Plaintiffs

"[A]ttorneys, like other professionals, must be held liable for economic injury arising from negligent representation." *Prudential Ins. Co. of America v. Dewey, Ballentine*, 80 N.Y.2d 377, 381 (1992) "There is no reason to arbitrarily limit the potentially liable defendants to [accountants]." *See Prudential Ins. Co.*, 80 N.Y.2d at 381. "New York courts have imposed liability on professionals for their failure to speak with care to third-parties with whom they are not in privity only where they have a special relationship with the third-party that approaches privity." *See Doehla v. Wathne Ltd. et al.*, No. 98-cv-6087, 1999 U.S. Dist. LEXIS 11787, at *57-58 (Aug. 3, 1999) *quoting Prudential Ins. Co.*, 80 N.Y.2d at 382. The criteria used to determine a special relationship are: "(1) an awareness by the maker of the statement that it is used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose;

and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Id.* at 384. Lawyers may owe a duty of care to a third-party if that lawyer drafted an opinion letter upon which the third-party relied. *Id.* at 385.

Conveniently forgotten by Defendants, Carter and other lawyers at Husch, drafted, and provided at least three opinion letters (the "Opinion Letters") directly to the Plaintiffs, in or about February 2014, for review.[7] (*See* Declaration of Vahbiz P. Karanjia, "Karanjia Decl." **Exh. A**). "When an attorney is asked to draft an opinion letter, he is put on notice that he must personally vouch for the statements made therein and that he personally may be held liable if they are untrue." *Friedman*, 1994 U.S. Dist. LEXIS 3404, at *17-18. Here, the Opinion Letters were specifically drafted to address whether physicians, in Kentucky, Louisiana, and Texas, who refer patients to a pharmacy licensed in that state, may then invest in that pharmacy. Karanjia Cert., **Exh. A**. They were relevant to Plaintiffs' investment in the Private Companies because they legitimize the business model of the Private Companies and of Titanium. First, it cannot be disputed that the Opinion Letters were prepared for the purpose of enticing Plaintiffs and other potential investors, because the subject of the Opinion Letters is whether a physician may also invest in a pharmacy.[8] The Opinion Letters were directly sent, via e-mail, to Plotkin, Tobias, and

---

[7] This Court should consider the Opinion Letters even though they were not attached to the Complaint because they are a vital part of the Complaint and opposition to Defendants' Motion to Dismiss. *See Marcus v. Frome*, 329 F. Supp. 2d 464, 468-469 (S.D.N.Y. 2004) "In deciding the motion [to dismiss] the Court may consider documents that the Plaintiffs relied on in bringing suit and that are either in Plaintiffs' possession or the Plaintiffs knew of when bringing suit . . .") (internal citations and quotations omitted). It is submitted that the Complaint alleges a claim for Negligent Misrepresentation. To the extent that the Court does not believe Plaintiffs have met their pleading requirements on that claim, Plaintiffs should be provided the opportunity to amend the Complaint to include specific allegations covering the Opinion Letters and Plaintiffs' reasonable reliance on them.

[8] Defendants may be quick to assert that the Opinion Letters contain a disclaimer warning that the letters should not be relied on by third-parties. However, Defendants sent the Opinion Letters, directly via e-mail, to Plotkin, Tobias, and their counsel. Carter, through her oral comments, and the Opinion letters supplied, invited reliance, and thus Defendants have the requisite special relationship.

their counsel, amongst others. Thus, the end aim of the Opinion Letters was to provide Plaintiffs with some of the legal basis legitimizing the investments.

Second, Plaintiffs relied in part on the Opinion Letters as evidenced by their decision to invest in the Private Companies. Finally, by sending the Opinion Letters directly to Plotkin, Tobias, and their counsel, Defendants clearly engaged in conduct with the understanding that Plaintiffs would rely on the Opinion Letters, as alleged in the Complaint in the Fourth Count. Defendants owed a duty to Plaintiffs.

     ii.     The Complaint Adequately Pleads that the Information Provided by Defendants was Incorrect and Plaintiffs Reasonably Relied on the Information

As adequately pled in the Complaint, Fourth Count, and argued above, Plaintiffs reasonably and justifiably relied on the numerous misrepresentations and omissions Defendants and the Nezami Sellers made and/or adopted in deciding to invest in the Private Companies and would not have made such investments had they known the falsity of the misrepresentations.

### E.  The Complaint Sufficiently Pleads Negligent Supervision

As detailed in the Complaint, Husch was on notice that Carter was a rogue partner working with a rogue client, with Husch allowing her to aid and abet the fraud. Carman, a member of Husch's management team, was involved in meetings in which Nezami made misrepresentations that were supported by Carter. After being removed from the meetings because Nezami stated that Carman was "too conservative" and "not aggressive enough," Carman, as a former member of management and the liaison with Husch management outside of Texas, either raised concerns that were ignored or failed to raise such concerns. Either way, Husch was negligent in its supervision of the lawyers working on the deal, and continued to do work for the Nezami Sellers and, through Carter, continued to make fraudulent misrepresentations in furtherance of the fraudulent scheme. This case is a primer for large international law firms

like Husch that when acquiring boutique, out-of-state, firms, they have a duty to make certain the lawyers in that firm are honest and will not use the relationship with the acquiring firm to plunge a sword into the hearts of unsuspecting and trusting third parties. *See* Plntfs' Am. Comp. at ¶¶ 104-108. Surely, Plaintiffs have sufficiently pled this cause of action.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.


Dated:   Somerset, New Jersey             Respectfully submitted,
   October 5, 2015

              EPSTEIN, ARLEN & OSTROVE, LLC


              By:   /s/ Elliot D. Ostrove
                  Elliot D. Ostrove, Esq.

              220 Davidson Avenue, Suite 102
              Somerset, NJ 08873
              (732) 828-8600
              *Attorneys for Plaintiffs*