**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------  X
Gansett One, LLC et al.,                                      :
                                                             :
                              Plaintiffs,                     :          15 Civ. 3551 (ALC)
                                                             :
                  - against -                                 :
                                                             :          MEMORANDUM &
Husch Blackwell, LLP et al.,                                 :          ORDER
                                                             :
                              Defendants.                     :
------------------------------------------------------------  X
```

**ANDREW L. CARTER, JR., District Judge:**

*1-12-16*

## I.    INTRODUCTION

A group of investors in medical companies accuses a law firm of conspiring with one of

its clients to fraudulently procure and then embezzle their investments. Plaintiffs Gansett One,

LLC, SES Wealth Advisors, LLC, GW Holdings, LLC, and Mast and Son, LLC (collectively,

"the investors") filed a state court action against the law firm Husch Blackwell, LLP, one of its

partners, Diane Carter, and several unnamed individuals and corporations (collectively, "the

defendants"). The investors brought a federal claim under the Racketeer Influenced and Corrupt

Organizations Act and state-law claims for common law fraud, aiding and abetting fraud,

negligent misrepresentation, and negligent supervision. The defendants removed the action to

this Court and now move to dismiss it under Federal Rule of Civil Procedure Rule 12(b)(6). For

the reasons herein, the defendants' motion is granted as to the federal claim. The remaining

claims are remanded to state court for adjudication.


## II.    BACKGROUND

Defendant Husch Blackwell, LLP ("Husch") is a Kansas-based law firm that employs

over 600 lawyers. First Amended Complaint ("FAC"), ¶ 28. One of them is Diane Carter, a

Husch partner specializing in healthcare and corporate law. Id. ¶ 29. For the past 11 years, Carter

has represented nonparty Kamran Nezami in both personal and business matters. Id. ¶¶ 37, 40. Through at least November 2014, Nezami owned several medical companies whose operations he controlled. Id. ¶¶ 45, 50. In September 2013, Nezami began diverting funds from those companies for his own use, purchasing sports cars, planes, security details, and several homes. Id. ¶ 99(c). As Nezami describes it, Carter "runs his life" and is the person who knows him better than anyone else. Id. ¶¶ 39, 66. She was therefore aware of the embezzlement. Id. ¶ 100.

Shortly after beginning to embezzle funds from his own companies, Nezami met the plaintiff investors in November 2013 and early 2014. Id. ¶ 57-58. Thereafter, he embarked on a scheme to fraudulently obtain their investments in the medical companies as a further source of funds to embezzle. Id. ¶ 6. Carter and Husch learned of Nezami's plan. Id. ¶¶ 6-7. Nezami promised Carter an equity interest in one of his medical companies in exchange for her participation in the scheme, which she accepted. Id. ¶¶ 21, 99(f). For its part, Husch weighed the fees it stood to gain from representation of Nezami in the ongoing scheme and also decided to participate. Id. ¶ 105.

Over the course of months, Nezami exchanged interstate telephone calls and met in person with the investors at least 17 times. Id. ¶¶ 59-60. At some or all of the meetings in which investment discussions took place, Carter accompanied Nezami. Id. ¶¶ 29, 61. Nezami's marketing efforts with the investors were successful, and between March 14, 2014 and May 27, 2014 they purchased over $1.35 million of securities in the medical companies. Id. ¶¶ 1, 55-56. Through those purchases, the investors also acquired an interest in Titanium Healthcare, Inc. ("Titanium"), because it was majority owned by an LLC that itself was majority owned by one of the medical companies. Id. ¶ 54.

Carter, along with unnamed attorneys at Husch, drafted five Purchase Agreements by which Nezami transferred a portion of his security interests in the medical companies to the investors. Id. ¶¶ 55, 91.[1] Those agreements represented that Nezami was transferring interests he owned in Global Molecular Labs, LLC, when he did not, in fact, own those interests. Id. ¶ 97(f). At an unspecified date after the signing of the Purchase Agreements, however, the Global Molecular Lab interests were gifted to the investors. Id. ¶ 51. The Purchase Agreements further

---

[1] The investors submit that the Purchase Agreements contained several fraudulent misrepresentations, a legal conclusion rather than a factual allegation. "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations removed). Further, "the Court is not required to accept as true pleadings that are directly contradicted by other factual statements in the . . . Complaint," Hansen v. Wwebnet, Inc., 2015 WL 4605670, at *3 n.1 (S.D.N.Y. July 31, 2015) (quoting Barberan v. Nationpoint, 706 F. Supp. 2d 408, 424 (S.D.N.Y. 2010)). Finally, because the plaintiffs attached the Purchase Agreements and other relevant documents to their complaint, the Court properly considers them on this Rule 12(b)(6) motion to dismiss. See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006). Under these principles, the Court declines to accept as true some of the investors' allegations of misrepresentations in the Purchase Agreements.

The Purchase Agreements warrantied that Nezami was the sole owner of the transferred interests, that the interests were free of encumbrances, and that there were no pending investigations or suits regarding the interests or the private companies. FAC ¶¶ 91(a)-(c). The investors allege that these warranties were misrepresentations because as of March 1, 2015, before the first Purchase Agreement had been drafted, Carter knew that Nezami had substantial tax liens and judgments against him, was a defendant in pending lawsuits seeking money from him, and was the subject of ongoing investigations by the Federal Bureau of Investigation, Internal Revenue Service, and Department of Homeland Security. Id., ¶¶ 97(a)-(e). But the warranties in the Purchase Agreements relate to the transferred security interests and companies alone, making no representations as to liens against or investigations of Nezami personally. Id. Exh. A ¶¶ (a)-(c). Therefore, even assuming the truth of these allegations, none of them transform the warranties into misrepresentations.

Similarly, the investors allege that the warranties of sole ownership in the Purchase Agreements were misrepresentations because they were drafted and executed after Carter had drafted separate Security Agreements between Nezami and an outside creditor that granted the creditor security interests in the medical companies. Id. ¶ 89, 92. In fact, only three of the Purchase Agreements were signed after the date of execution of the Security Agreements: April 25, 2014. Id., Exh. E-G. And though the Security Agreements grant the creditor a 1.0% security interest in several of the medical companies, id., nowhere in their complaint do the investors allege that the 1.0% interests of the Security Agreements comprised the same securities transferred to the investors in the Purchase Agreements. Therefore, the warranties of Nezami's sole ownership over the transferred interests in the Purchase Agreements signed after April 25, 2014 are not rendered misrepresentations by the existence of the Security Agreements.

contained put options that Carter knew Nezami never intended to honor.[2] Id. ¶ 93. When the investors later attempted to exercise those options, Nezami did, in fact, refuse to honor them. Id. ¶ 94. Nezami has filed a suit in Texas state court against the investors over that dispute. Id. ¶ 95.

At some point between February and April 2014, the medical companies discovered that Nezami had embezzled their funds. Id. ¶¶ 100-101. Prior to at least some of the investors' decisions to invest, the medical companies sought legal advice from Carter on how to recover the money. Id. ¶ 8. The companies then established a payment plan with Nezami, under which the embezzled funds would be treated retroactively as loans that Nezami would repay with the investors' money. Id. ¶¶ 8, 13. On May 23, 2014, Nezami signed two Promissory Notes between himself and the companies that Carter and other Husch lawyers prepared. Id. ¶¶ 14, 99(c). At unspecified dates, certain of the companies further demanded that Nezami resign from governance over them as a result of his embezzlement and unnamed Husch lawyers drafted the resignation documents. Id. ¶ 100. Nezami, with Carter's knowledge, falsely told the investors that he had resigned because he could not govern both the medical companies and Titanium, rather than because of the discovery of his embezzlement. Id. ¶ 101.

Sometime before August 2014, Nezami threatened the life of a now former executive of one of the medical companies who refused to join in the conspiracy to embezzle funds. Id. ¶ 22. An unspecified person also brought a "'trumped up' charge of wrongdoing" against the executive to remove him from his position. Id. ¶ 23. On July 30, 2014, the executive was

---

[2] "A put is an option to sell at a certain price within a certain period . . . . The economic raison d'être of these options is to serve as a hedge (a form of insurance) against future market movements." Segen ex rel. KFx Inc. v. Westcliff Capital Mgmt., LLC, 299 F. Supp. 2d 262, 273 n.4 (S.D.N.Y. 2004) (quoting Louis Loss & Joel Seligman, *Securities Regulation* 1137 (3d ed.2003)).

dismissed from his position and Carter asked him to sign a Release and Confidentiality Agreement in exchange for a sum of money. Id.

In addition to the legal documents that Carter and other Husch attorneys prepared in furtherance of the embezzlement scheme, Carter knowingly failed to correct Nezami when he repeatedly lied to the investors, provided them with inaccurate documents, and omitted material information in their investment discussions. Such statements, documents, or omissions include: inaccurate valuations of certain of the medical companies, id. ¶¶ 53, 72; financial statements of the medical companies that excluded the loans made to Nezami in order to cover up his embezzlement, id. ¶ 99(c); financial statements of Nezami's that misrepresented his ownership in certain assets, id. ¶ 99(e); financial statements of the medical companies with profit projections that later failed to materialize, id. ¶¶ 99(g)-(h); a boast that Nezami planned to buy a football team after Titanium was listed on the New York Stock Exchange, when Titanium's management structure precluded it from ever being listed, id. ¶¶ 86-87; statements that Nezami had served in the military, when he never had, id. ¶ 98; a statement misrepresenting the number of doctors who had invested in one of the medical companies, id. ¶ 99(i); and a failure to inform the investors of a million-dollar over-distribution to shareholders from one of the medical companies, id. ¶ 99(j). None of these statements, documents, or omissions bear dates.

Only one statement in the complaint is accompanied by a rough date: sometime between November 2013 and March 2014 Nezami told an investor that the pediatric cancer charity started by that investor would be well taken care of, possibly through financial sponsorship by one of the medical companies. Id. ¶¶ 77-79. Carter was present during that discussion. Id. ¶ 78.

Finally, the investors allege that the scheme between Nezami, Carter, and Husch is ongoing. Id. ¶ 118. Even after the investors wired the funds indicated in the Purchase Agreement

to Nezami, he continued to solicit them for more money. Id. ¶ 72. He also sought their assistance in soliciting additional funds from private equity firms and in establishing business relationships with medical providers nationwide. Id. ¶ 72, 82. As part of this effort, the investors accompanied Nezami on tours of office spaces in New York City in April 2014. Id. ¶ 102.

## II.    DISCUSSION

### A.  Jurisdiction

The investors allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and claims of common law fraud, aiding and abetting fraud, negligent misrepresentation, and negligent supervision. All agree that 28 U.S.C. § 1331 gives the Court jurisdiction to hear the RICO claims, because they allege federal questions. Jurisdiction over the state-law claims remains an open question.

After the defendants asserted diversity jurisdiction under 28 U.S.C. § 1332, the investors denied complete diversity of citizenship amongst the parties. At the conclusion of jurisdictional discovery, the defendants then withdrew without prejudice their claim of diversity jurisdiction.

Both parties, however, continue to assert that the Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. That type of jurisdiction is discretionary, hinging partially on whether "the district court has dismissed all claims over which it has original jurisdiction." Id. § 1367(c)(2)-(3). The Court thus explains its discretionary decision not to exercise supplemental jurisdiction after discussion of the federal claims alleged.

### B.  Legal Standard

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). On a motion to dismiss, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor. Harris v. Mills, 572 F.3d 66, 71 (2d Cir.2009). But to satisfy Rule 12(b)(6), a plaintiff must offer "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir.2010). Ultimately, on a motion to dismiss "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013) (internal quotations and citation omitted).

Where fraud is alleged in a complaint, Rule 9(b) of the Federal Rules of Civil Procedure demands "particularity" in the allegations. Particularity requires that the plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). "The primary purpose of Rule 9(b) is to afford [a] defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." Ross v. Bolton, 904 F.2d 819, 823 (2d Cir. 1990). It also "safeguards [a] defendant's reputation and goodwill from improvident charges of wrongdoing . . . and it serves to inhibit the institution of strike suits." Id., (citing Decker v. Massey–Ferguson, Ltd., 681 F.2d 111, 114–15 (2d Cir.1982); Segal v. Gordon, 467 F.2d 602, 607 (2d Cir.1972).

"[A]lthough Rule 9(b) permits knowledge to be averred generally, [courts] have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotations omitted). A strong inference "may be established either (a) by alleging facts

to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging

facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006). Strong circumstantial evidence

includes a showing that defendants (1) "benefitted in a concrete and personal way from the

purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to

information suggesting that their public statements were not accurate"; or (4) "failed to check

information they had a duty to monitor." ECA, Local 134 IBEW Joint Pension Trust of Chicago

v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d Cir. 2009).

### C. Analysis

#### a. The investors fail to state a RICO claim.

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18

U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the

violation of Section 1962." DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001) (internal

quotations removed). The investors allege a violation of the RICO statute at § 1962(c). That

section makes it "unlawful for any person employed by or associated with any enterprise

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt." To state a claim under § 1962(c), a plaintiff

must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Id.

at 306. The investors inadequately allege either conduct or a pattern.

#### i. The investors fail to allege that the defendants engaged in conduct within the meaning of the RICO statute.

"Conduct" within the meaning of Section 1962(c) requires participation in "the operation

or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170 (1993)). "An

enterprise may be operated, for RICO purposes, by . . . 'lower-rung participants in the enterprise who are under the direction of upper management,' or 'others 'associated with' the enterprise who exert control over it, as for example, by bribery.'" Azrielli v. Cohen Law Offices, 21 F.3d 512, 521 (2d Cir. 1994) (quoting Reves, 507 U.S. at 184). But "the simple taking of directions and performance of tasks that are necessary or helpful to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." United States v. Viola, 35 F.3d 37, 41 (2d Cir. 1994) (internal quotations removed), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). Although the test is a "relatively low hurdle for plaintiffs to clear, . . . especially at the pleading stage, . . . it is clear that the RICO defendant must have played '*some* part in directing [the enterprise's] affairs.'" First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004) (quoting DeFalco, 244 F.3d at 309) (emphasis in original). It is also clear that some complaints do not overcome that hurdle.

In Redtail Leasing, Inc. v. Bellezza, 2001 WL 863556, at *4 (S.D.N.Y. July 31, 2001), cited by the Second Circuit in Satinwood, an investor obtained nonpublic information that he used to engage in insider trading. Yet even though the investor profited from the scheme by personally engaging in the underlying fraud, there was "no allegation that he directed the insider trading. . . ." Therefore, based on the allegations in the complaint, the investor "indisputably did not direct the affairs of the enterprise." Id. In Azrielli, the Second Circuit dismissed a RICO claim against a lawyer where the summary judgment record showed that "he had merely acted as an attorney for the other individual defendants . . . [and] that he had no role in the conception, creation, or execution" of the RICO conspiracy. Azrielli, 21 F.3d at 521.

None of this is to say that a lawyer and law firm's "status[es] as 'outside purveyors of services' . . . automatically shield them from liability as a matter of law." United States Fire Ins.

Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004); see also Friedman v. Hartmann, 1994 WL 97104, at *4 (S.D.N.Y. March 23, 1994) ("Whether [defendant] participated in the conduct of the racketeering enterprise depends not . . . on her status as a lawyer but on her actual conduct."). A RICO claim is properly dismissed, however, where "[d]efendants, in their roles as an attorney and law firm, did [not do] anything more than offer their professional legal services . . . ." Nastro v. D'Onofrio, 542 F. Supp. 2d 207, 217 (D. Conn. 2008). Indeed, "the performance of these duties would not make the [d]efendants liable under RICO even if they had knowledge of the alleged enterprise's illicit nature." Id. (citing Morin v. Trupin, 835 F.Supp. 126, 135 (S.D.N.Y.1993); Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L., 832 F. Supp. 585, 590-91 (E.D.N.Y. 1993) (dismissing RICO claims against legal services providers)).

The investors' complaint against Carter and Husch fails to allege that the defendants directed a RICO enterprise. Instead, it repeatedly alleges only that Carter and Husch gave their "help and active assistance," id. ¶ 1, "advice and acquiescence," id. ¶ 15, or "knowledge, encouragement, and assistance," id. ¶ 102. Charitably read, a singular allegation that Carter and Husch "participated in a common agreement, plan, and scheme," FAC ¶ 109, could suggest that the defendants commonly conceived of the enterprise. But the complaint lacks factual allegations that would make such an inference reasonable. Nowhere do the investors assert that Carter or Husch had a role in the conception, creation, or execution of the RICO enterprise, all attributed to Nezami. Instead, the complaint accuses Carter and Husch of standing by silently while knowingly observing Nezami engage in fraud. Such silence would be plausibly helpful to Nezami's RICO enterprise, but it does not amount to direction of it.

The investors posit that the Promissory Notes between Nezami and the medical companies are proof of a scheme orchestrated by Carter to cover up Nezami's embezzlements. But their complaint itself alleges that the medical companies "established" the payment plan, not as a cover up, but as the means by which Nezami would return the funds he had embezzled. FAC ¶ 8. Even if that repayment plan were plausible proof of a fraudulent cover-up scheme, neither Carter nor Husch is alleged to have conceived or directed the plan, but merely to have contributed "encouragement[] and advice" to it. Id. Their provision of legal advice fails to lead to a plausible allegation that they directed a RICO enterprise.

The investors' other allegations of Carter and Husch's active participation in the enterprise are limited to the drafting of legal documents and Carter's request that a dismissed executive of one of the medical companies sign a Release and Confidentiality Agreement in exchange for a sum of money. These standard actions taken by Carter and Husch in the course of representing their client did not "exceed[] their professional duties." Nastro, 542 F. Supp. 2d at 217. Rather, like the lawyer in Azrielli, they most plausibly lead to the conclusion that Carter and Husch "acted as no more than their [client's] attorney." Azrielli, 21 F.3d at 521. Acting as an attorney for the operator of a RICO enterprise operator, without exerting some type of direction over the enterprise itself, fails to allege RICO conduct.

The investors' case is not assisted by United States Fire Ins. Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004), where a district court denied a motion to dismiss a RICO claim against insurance brokers who "were key participants [in the RICO enterprise], by making critical misrepresentations, creating false documents and, . . . serving as the point of communications" between an insurance company and another defendant. Unlike the plaintiff investors here, the United Limousine Serv., Inc. plaintiff specifically alleged that the

brokers "conducted and controlled the operation or management of the enterprise," which itself "was structured with [the brokers] at the top as the point of communication with plaintiff." Id.

Similarly, in The Cadle Co. v. Flanagan, 2006 WL 860063, at *11 (D. Conn. Mar. 31, 2006), a district court upheld a RICO verdict against a law firm where evidence supported a finding that it had "fil[ed] . . . false claim exemptions and compliance statements" because that was "conduct reaching beyond the furnishing of advice . . . ." The documents here that could be considered "false" include financial statements of the companies and of Nezami that included misrepresentations. But the investors do not allege that these were either drafted by or provided to them by Carter or Husch. While the investors do allege that Carter drafted the Purchase Agreements, those documents are not "false": there are no allegations that the exchanges memorialized in the Purchase Agreements were not executed.

Certain provisions of the Purchase Agreements are alleged to be fraudulent, but the Court explained above why such legal conclusions are not accepted as true on a motion to dismiss and were otherwise implausible. Supra at n.1. Two allegations survive that analysis: that Carter knew that Nezami did not possess interests in one of the medical companies listed in the Purchase Agreements and that she knew Nezami never intended to honor the put options included therein. The first is insufficient to sustain a claim of RICO wire fraud because the investors also allege that they later received the missing interests as gifts and can therefore show no injury. A RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). As for the second allegation, even if Carter knew at the time of drafting the agreements that Nezami would in the future deny the put options, that knowledge alone does not support an inference that Carter conceived of or directed Nezami's decision to do

so. The remaining allegations of fraud in the Purchase Agreements must therefore also be dismissed.

### ii. The investors fail to allege a pattern of racketeering activity within the meaning of the RICO statute.

By statute, a RICO pattern must comprise at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). The investors allege violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, both of which suffice for predicate RICO acts of racketeering. 18 U.S.C. § 1961(1). Because the complaint fails to identify an actual mailing, a RICO claim based in mail fraud must be dismissed. The complaint does identify telephone, email, and wire transfers of money in support of its wire fraud claim. A wire fraud pleading requires "1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir.1996).

Allegations of wire fraud, like "all allegations of fraudulent predicate acts, are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d at 178. Where a complaint pleads fraud in actual wire communications themselves, it pleads "per se" wire fraud. Am. Med. Ass'n v. United Healthcare Corp., 588 F. Supp. 2d 432, 442 (S.D.N.Y. 2008). In a per se wire fraud claim, Rule 9(b) demands that the complaint describe individual wire communications with particularity, as well as identify the purpose of the communications within the fraudulent scheme. McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir. 1992); In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

In contrast, when a "plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud," courts have held that "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." Id.; see also Angermeir v. Cohen, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (citing district court cases within the Second Circuit applying the "detailed description of the underlying scheme" standard). Just what a "detailed description" amounts to has varied across cases. Some decisions seem to comply with Rule 9(b) in name only, looking to whether there are sufficient facts to plausibly infer an underlying scheme. Sumitomo, 995 F. Supp. at 456-457; Mayfield v. Asta Funding, Inc., 95 F. Supp. 3d 685, 698-99 (S.D.N.Y. 2015). Other decisions demand compliance with at least some part of 9(b) by requiring factual allegations as to the underlying scheme that give a strong inference of fraudulent intent. Aiu Ins. Co. v. Olmecs Med. Supply, Inc., 2005 WL 3710370, at *12 (E.D.N.Y. Feb. 22, 2005). Finally, some decisions demand traditional particularity as to the allegations of fraud in the underlying scheme itself. Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq., 758 F. Supp. 2d 153, 177 (E.D.N.Y. 2010) aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq., 443 F. App'x 582 (2d Cir. 2011); Evercrete Corp. v. H-Cap Ltd., 429 F. Supp. 2d 612, 631 (S.D.N.Y. 2006).

The third position seems correct, at least where, as here, the claims comprising the underlying RICO scheme to defraud depend on specific misrepresentations or omissions. Sumitomo advanced a more lenient pleading standard for "scheme to defraud" cases because "[t]he term 'scheme to defraud' is measured by a 'nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play[,] and right dealing in the general [and] business life of members of society.'" Sumitomo, 995 F. Supp. at 455 (quoting United States v.

Trapilo, 130 F.3d 547, 550 n.3 (2d Cir.1997) (finding that smuggling, without an allegation of misrepresentation or deceit, satisfied the requirements for a "scheme to defraud" under the wire fraud statute). Sumitomo also worried that strict application of Rule 9(b) "would, in effect, obstruct all plaintiffs, including those with valid claims, from initiating civil RICO actions." Id. at 456. Yet it makes for an odd outcome that a plaintiff should be able to escape her burden under Rule 9(b) simply by invoking RICO. After all, with its traditional rationales of preventing strike suits and safeguarding defendants' reputations, Rule 9(b) seems almost tailor made to protect from abuses of civil RICO's "unusually potent weapon" of treble damages and "inevitable stigmatizing effect on those named as defendants." Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) aff'd sub nom. Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc., 113 F.3d 1229 (2d Cir. 1997) (citing Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir.1990)).

Further, it is difficult to square Sumitomo's concerns with the Second Circuit's more recent dictate that "all allegations of fraudulent [RICO] predicate acts[] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d at 178. Nor does that stance represent a novel approach to RICO pleading standards. In S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d at 634, decided the same year as but subsequent to Sumitomo, the Second Circuit dismissed under Rule 9(b)'s heightened pleading standard a RICO claim alleging both per se mail fraud and a master plan to defraud in furtherance of which mail was used (albeit without using those exact terms, which took shape under later case law). Under either theory of fraud, the court found, the plaintiffs had failed to plead facts giving rise to a strong inference of fraudulent intent. Id.

As in S.Q.K.F.C., the investors' claim here fails to comply with 9(b) particularity. The complaint alleges per se fraud in wire communications themselves, mentioning interstate emails of fraudulent financial statements and the fraudulent Purchase Agreements and interstate telephone calls where Nezami made fraudulent statements that Husch lawyers failed to correct. None of these allegations, as currently pleaded, satisfy Rule 9(b). The investors fail to allege who emailed them the financial statements or Purchase Agreements. They do not identify which statements of Nezami's were made by phone as opposed to in person. Finally, they attach no dates to either the provision of fraudulent documents or the utterance of fraudulent statements. Even if those allegations were repled with added detail, the complaint would lack facts to indicate a strong inference of fraudulent intent on the parts of Carter and Husch. The investors allege that Carter and Husch had a financial stake in Nezami's scheme that gave them motives to commit fraud, but "a generalized profit motive that could be imputed to any company . . . has been consistently rejected as a basis for inferring fraudulent intent in mail and wire fraud cases." Sanchez v. ASA Coll., Inc., 2015 WL 3540836, at *8 (S.D.N.Y. June 5, 2015) (internal quotations omitted).

Nor is there strong circumstantial evidence before the Court that Carter and Husch engaged in deliberately illegal behavior. The investors allege only a legal conclusion by stating that Carter's participation in the scheme violated her obligations under the Texas Disciplinary Rules of Professional Conduct for lawyers. At any rate, the preamble to the Texas rules states that they "do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached." Tex. Disc. R. Prof. Cond., ¶ 15. Any violation of the disciplinary rules thus fails to provide strong circumstantial evidence of

conscious misbehavior or recklessness. The RICO claim based on per se wire fraud must therefore be dismissed for failure to be alleged with particularity.

The result is the same for the investors' claim based on wires used in furtherance of a master plan to defraud. Though the investors allege interstate wire communications in the form of the transmission of the Purchase Agreements through email and the acceptance of the investors' funds through wire transfer, the master plan to defraud remains unacceptably nebulous for the reasons stated above.

Even if the more lenient pleading standard of Sumitomo were applied, the investors would still fail to adequately allege a pattern of racketeering. To satisfy their burden, the investors must "allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." Satinwood, Inc., 385 F.3d at 180 (citing GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 466 (2d Cir.1995)). The Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years." Id. at 181. Further, "the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." Id. Assuming that the emailed purchase agreements and wire transfers of money were alleged with enough particularity to satisfy Rule 9(b), those acts spanned a period of only three months, from March to May 2014. They therefore fail to satisfy even the threshold inquiry for a closed-ended pattern.

"To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 185 (2d Cir. 2008) (quoting

Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 243 (2d Cir. 1999)).

"However, where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Cofacredit, 187 F.3d at 243. The defendants correctly state that there are no facts in the complaint to plausibly suggest that Husch does not primarily conduct a legitimate business. But the enterprise alleged by the investors is not Husch's ongoing business as a law firm. Instead, it is the specific enterprise alleged between Husch, Carter, and Nezami to defraud investors and embezzle their money. Even if the complaint plausibly alleged the existence of that enterprise, it fails to state facts from which to infer its ongoing nature.

The investors' case for an ongoing scheme rests on actions taken after their investments were made. These include continued solicitation for more investments, tours of office space in New York City that would put Nezami in proximity with private equity firms, discussions about business connections with hospitals and doctors across the country, and Nezami's filing of suit against the investors in Texas over the put options in the Purchase Agreements. These facts, however, are only part of the story told by the complaint. Additional details provided by the investors themselves contradict the viability of an ongoing scheme to embezzle. For one, the investors allege that Nezami has now stepped down from his management positions in the companies, so his access to funds invested in them is presumably restricted. Second, the Promissory Note by which the companies arranged for Nezami to repay funds he had embezzled—alleged to be part of the ongoing cover-up scheme—bears a maturity date of July 2014. FAC, Exh. E-F. Though the investors filed their complaint a year later, in July 2015, it contains no allegation that Nezami defaulted on the terms of the loan. Most glaring of all is the

absence of any allegation that Nezami has continued to embezzle funds. In other words, the investors themselves allege facts that indicate that even if Nezami embezzled funds from the company at some point it the past, upon discovery of his malfeasance he was removed from a position that would allow him to continue to do so in the future, repaid the funds in full, and has refrained from embezzling since. Finally, these allegations concern only Nezami himself, failing to plausibly connect Carter and Husch to their client's actions.

The investors cite <u>Fresh Meadow Food Servs., LLC v. RB 175 Corp.</u>, 282 F. App'x 94, 100 (2d Cir. 2008) for the proposition that Nezami's embezzlement, even if it ended, was only one piece of a broader scheme to fraudulently induce investments. In <u>Fresh Meadow</u>, a defendant landowner leased his property to the plaintiff, falsely telling him that underground storage tanks containing gasoline had been removed. The plaintiff lessee discovered the tanks and paid for their removal. The landowner than argued that any RICO scheme to fraudulently misrepresent the environmental condition of the property to his commercial advantage was terminated by the removal of the tanks. The Second Circuit disagreed because as a matter of New York property law the landowner may still have been liable for environmental damage to his property after the tanks' removal and because in a pending investigation by the New York State Department of Environmental Conservation, the landowner allegedly lied to the agency in order to shirk his responsibility under law. Unlike the continued lies of the defendant in <u>Fresh Meadow</u>, the investors allege no specific, continuing frauds perpetrated by Carter or Husch after the original investments. Instead, they point only to Nezami's statements that "business was booming and exploding," the companies were "growing at an exponential pace," and that he had the "opportunity of a lifetime." <u>FAC</u>, ¶ 72. These statements made by a third party in the context of

ongoing business discussions at which it is not specifically alleged that Carter or Husch were even present are insufficient to establish an ongoing RICO pattern.

Also unavailing is the investors' reliance on Friedman v. Hartmann, 1994 WL 97104, at *5 (S.D.N.Y. Mar. 23, 1994), where a district court found an ongoing scheme properly alleged when "[i]t [was] clear that further payments were envisaged" in a real estate deal between the parties. Here, no further payments were envisaged; only further discussions, in which the investors fail to identify frauds perpetrated by the defendants. To the extent that the investors rely on Friedman's statement that, "as a general matter, a partnership is an ongoing entity that is likely to require further capital contributions," id., the Court finds that principle inapplicable here, where the investors refused to provide further capital contributions even after Nezami's entreaties.

Because the investors insufficiently plead conduct or a pattern, their RICO claims are dismissed in their entirety.

### b. The Court declines to exercise supplemental jurisdiction over the investors' state-law claims and remands them to state court.

Federal courts may exercise supplemental jurisdiction over state-law claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution . . . ." 28 U.S.C. § 1367(a). "For purposes of section 1367(a), claims form part of the same case or controversy if they derive from a common nucleus of operative fact." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011) (internal quotations removed). Because the investors' state-law claims all hinge on the services that Husch and Carter provided to Nezami in furtherance of the allegedly fraudulent scheme, they arise from a common nucleus of operative fact. See Treglia v.

Town of Manlius, 313 F.3d 713, 723 (2d Cir. 2002) (supplemental jurisdiction is appropriate

where a state claim "arises out of approximately the same set of events" as the federal claim).

Yet even where claims arise from a common nucleus of operative fact, supplemental

jurisdiction is discretionary. Section 1367(c) lists four circumstances under which "courts may

decline to exercise supplemental jurisdiction over a claim under subsection (a)," including §

(c)(3): if "the district court has dismissed all claims over which it has original jurisdiction . . . ."

"Where section 1367(a) is satisfied, the discretion to decline supplemental jurisdiction is

available *only if* founded upon an enumerated category of subsection 1367(c)." Shahriar, 659

F.3d at 245 (emphasis in original). Further, "a district court should not decline to exercise

supplemental jurisdiction unless it also determines that doing so would not promote the values

articulated in [United Mine Workers of America v.] Gibbs, 383 U.S. 715, 726 (1966)]: economy,

convenience, fairness, and comity." Jones v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir.

2004).

Because the Court has dismissed in their entirety the RICO claims, § 1367(c)(3) is

implicated here. "[I]n the usual case in which all federal-law claims are eliminated before trial,

the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining

state-law claims." Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006)

(quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 350 n. 7 (1988)). This is because "[n]eedless

decisions of state law should be avoided both as a matter of comity and to promote justice

between the parties, by procuring for them a surer-footed reading of applicable law. Gibbs, 383

U.S. at 726. Further, because the federal claims here are "eliminated on a motion to dismiss,

prior to the investment of significant judicial resources," the parties will suffer "no extraordinary

inconvenience or inequity occasioned by permitting the claims to be refiled in state court where

they will be afforded surer-footed reading of applicable law." Kolari, 455 F.3d at 123 (internal quotations omitted). Principles of economy, convenience, fairness, and comity thus undergird the Court's discretionary decision to decline supplemental jurisdiction.

By letter dated November 17, 2015 the investors requested that in the event that this Court dismiss the RICO claim, it remand the remaining state-law claims for a decision by a state court. In light of the above analysis, the Court grants that request.

### III. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the RICO claims is granted. The remaining claims are remanded to state court for adjudication.

**SO ORDERED.**

Dated:    **New York, New York**
          **January 12, 2016**

                                  **ANDREW L. CARTER, JR.**
                                  **United States District Judge**